## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

| | | |
|---|---|---|
| **JANE DOE 1, JANE DOE 2,** | ) | |
| **JANE DOE 3, JANE DOE 4,** | ) | |
| **JANE DOE 5,** | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 18-cv-3054** |
| | ) | |
| **CITY OF CHICAGO, a Municipal** | ) | |
| **Corporation,** | ) | |
| *Defendant.* | ) | **JURY DEMANDED** |
| | ) | |

## COMPLAINT

Plaintiffs, Jane Does 1-5, by and through undersigned Counsel, alleges the following against Defendant, the City of Chicago:

### I.  NATURE OF THE CLAIMS

This is an action brought to remedy discrimination in employment on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq*., 42 U.S.C. § 1983, and the Illinois Human Rights Act, 775 ILCS 5/2 *et seq*. ("IHRA"). Plaintiffs seek declaratory and injunctive relief and other compensatory and equitable make-whole relief both to secure future protection and to redress the past deprivation of the rights promised to them under federal and state law.

Plaintiffs are all employed by the Defendant ("City") and work as paramedics for the Chicago Fire Department ("CFD"). Jane Does 1, 3, 4, 5 have been sexually harassed and intimidated by superiors, and Jane Doe 2 received the same treatment from a colleague.

The CFD, as a pattern or practice, has allowed sexual harassment, gender discrimination and retaliation to be pervasive throughout its firehouses and facilities. This conduct has caused

Plaintiffs to go to work in fear. Plaintiffs seek redress from the City's illegal conduct, including the implementation of proper sexual harassment training and the enforcement of a zero-tolerance policy against workplace violence and sexual harassment so they may continue their careers at CFD and prevent other females from experiencing this trauma.

## II.     JURISDICTION AND VENUE

1.      This Court has jurisdiction over Plaintiffs' federal claims pursuant 42 U.S.C. § 2000e-5(f)(3) (Title VII), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1443 (civil rights).

2.      This Court has supplemental jurisdiction over Plaintiffs' state law claims, pursuant to 42 U.S.C. § 1367.

3.      Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b), because the City resides in this District and a substantial part of the events or omissions giving rise to the claims alleged occurred in this District.

## III.    PARTIES

### a.  PLAINTIFFS

4.      Plaintiff Jane Doe 1 is a female Paramedic-in-Charge with the CFD. She has worked for the City since December 16, 2014.

5.      Plaintiff Jane Doe 2 is a female paramedic with the CFD. She has worked for the CFD since August 1, 2002.

6.      Plaintiff Jane Doe 3 is a female paramedic with the CFD. She has worked for the CFD since August 2014.

7.      Plaintiff Jane Doe 4 is a paramedic with the CFD. She has worked for the CFD since May 2015.

8.      Plaintiff Jane Doe 5 is a paramedic with the CFD. She has worked for the CFD since December 2005.

9.      Plaintiffs have met all administrative prerequisites for filing suit under Title VII, 42 U.S.C. § 2000e. On January 29, 2018, Plaintiffs filed charges with the Equal Employment Opportunity Commission ("EEOC") of discrimination including hostile work environment, disparate treatment, retaliation, pattern and practice based on gender discrimination under Title VII and the Illinois Human Rights Act. On March 30, 2018, the Department of Justice ("DOJ") issued Right to Sue letters. A copy of the charges (Exhibits 1-5) and the Right to Sue letters (Exhibits 6-10) are attached to this Complaint. Plaintiffs have filed this complaint within 90 days of their receipt of notice of their right to sue from the DOJ.

10.     At all times relevant to this Complaint, Jane Does 1-5 have been employees as defined by Title VII and the IHRA. 42 U.S.C. § 2000e(f); 775 ILCS 5/2-101(A).

### b.  DEFENDANT

11.     The City of Chicago was incorporated as a municipal corporation on March 4, 1837, and conducts business within the State of Illinois. City owns and operates the CFD, which employs at least fifteen (15) or more employees on a continuous basis and who, by virtue of its employment as a municipal corporation, is considered to be a state official or state actor. The City is and was at all times relevant to the Complaint Plaintiffs' "employer" as defined by Title VII and the IHRA. 42 U.S.C. § 2000e(b); 775 ILCS 5/2-101(B).

### IV.   FACTUAL ALLEGATIONS AND CLAIMS SPECIFIC TO EACH JANE DOE

### JANE DOE 1

The following constitutes charges of discrimination against the City of Chicago. The causes of action included in this document:

- Sexual Harassment – Hostile Work Environment under Title VII

- Sexual Harassment – Hostile Work Environment under IHRA
- Sexual Harassment – Quid Pro Quo under Title VII
- Sexual Harassment – Quid Pro Quo under IHRA
- Retaliation for Reporting/Opposing Sexual Harassment under Title VII
- Retaliation for Reporting/Opposing Sexual Harassment under IHRA
- Gender Discrimination (Disparate Treatment) in Violation of Title VII
- Gender Discrimination (Disparate Treatment) in Violation of IHRA

## **FACTUAL ALLEGATIONS**

12.     Jane Doe 1 is a Paramedic-in-Charge ("PIC") with the Chicago Fire Department. She has worked for the CFD since December 16, 2014.

13.     Starting on October 16, 2017 to present, she was subjected to sexual harassment by Field Chief (FC) Richard Raney, her superior.

14.     At all times relevant to the Complaint, Raney has had authority to take tangible employment actions against the Jane Doe 1, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

15.     At approximately 9 a.m. on October 16, 2017, near the ambulance bay of Northwestern Hospital, Raney told Jane Doe 1 in graphic detail how his wife of 16 years is a grandmother and acts like it. He stated that she will not have sex with him or give him "blow jobs" anymore.

16.     Raney told Jane Doe 1 that he wanted a "no strings" relationship, "so if we go on calls together, there is no winking, no smiles, no looking at each other."

17.     Jane Doe 1 told him that "my husband is a police officer," and Raney replied, "I saw that," which led her to believe that he purposely sought out and viewed her personnel file.

18.     He then stated, "I have never found anyone so attractive on the job" and he was attracted to Jane Doe 1.

19.     She walked away as fast as she could and immediately told another paramedic about this encounter and that Raney propositioned her to have a sexual affair.

20.     That same day, October 16, 2017, Jane Doe 1 reported Raney's conduct to Paramedic In Charge ("PIC") TJ Faizi, however, the sexual harassment continued.

21.     Jane Doe 1 asked PIC Faizi not to leave her. Just minutes later that morning while still in the ambulance bay at the hospital, Raney told her that he needed to talk with her, and she walked away from PIC Faizi.

22.     Raney then asked if Jane Doe 1 would be interested in going to lunch sometime so they could talk about this. He again said, "I have this attraction for you. My wife will not have sex with me. I am just interested in a no strings relationship."

23.     He also stated, "I need that type of relationship that if we both end up on a medical call you will not wink at me, shoot me a look, or acknowledge me in any way, we have to be cool with one another."

24.     Jane Doe 1 told him that she needed to go back to work. She made it clear that she did not want any sort of relationship with him.

25.     Later that same day, Raney sent Jane Doe 1 several sexually inappropriate text messages that indicated he was following her shift-to-shift ambulance assignments through the online scheduling system ("Manpower"). These texts began shortly before noon.  This included the following statements:

      a.  11:42 AM – From Raney "Ambo 39 next day. Whoo hoo!"

      b.  12:03 PM – From Raney "I talked to Juan, and he said they don't have a record of it. Check with the person you have a trade with, and once they confirm that they will be there put in a form 2 to request an emergency trade. I'll hook up with you later (nyuck nyuck) get the form and make sure you get off. Man, that came out wrong!"

    c.   12:08 PM – Response from Jane Doe 1 "…Ok. I'm on it!"

    d.   12:09 PM – Response from Raney "Kinda wish you were (sad face emoji)"

    e.   12:11 PM – From Raney "I mean on the form! Boy, nothing seems to cum out right today."

    f.   1:03 PM – Response from Jane Doe 1 "Haha! Ur funny!"

    g.   1:08 PM – Response from Raney "Yeah, that and $20 will get me lai… err laughed at."

26.    At approximately 3p.m. that same day, Jane Doe 1's ambulance broke down.

27.    Raney showed up asking for her to ride with him alone in his work vehicle while the ambulance was towed to the fleet garage.

28.    While Raney went to the bathroom, Jane Doe 1 immediately told her partner, Fire Paramedic Dan Bojarowicz that he would ride with Raney, and she would ride with the tow truck driver.

29.    Jane Doe 1 feared she would be sexually assaulted.

30.    Jane Doe 1 jumped in the tow truck cab and they left before Raney could speak with her again.

31.    Later that same day, Raney continued to send Jane Doe 1 sexually inappropriate text messages:

    a.   7:53 PM – From Raney "Last time I bother you, I promise! I'm pretty upfront, as well as pragmatic. I've let you know that I'm interested. If you are, just let me know. If you're not, that's totally cool. I won't bring it up again. I don't want you to feel any pressure. Whatsoever. You don't even have to respond if you're not interested. I would hate it to interfere with our working relationship."

    b.   8:24 PM – From Raney "Please disregard my previous text. That was totally inappropriate and I apologize."

    c.   8:36 PM – From Raney "I wouldn't think less of you no matter what type of relationship we had. As I said earlier, I have an intense attraction to you, but I can certainly keep it to myself."

32.     The following day, October 17, 2017, at 7:18 PM, Raney texted Jane Doe 1 again stating: "Good afternoon young lady, I hope your night wasn't terrible. Let me know if you're interested in meeting for brunch either tomorrow or Thursday. Otherwise have a good evening."

33.      On the morning of October 24, 2017, Jane Doe 1 exchanged text messages with Raney regarding a class she was attending. He asked Jane Doe 1 to let him know what the class was about, and she told him that she would. He then followed that text with: "That would be good. It would also give us the opportunity to talk about our mutual dissent into naughty hell (smiley emoji)."

34.     As a Field Chief, Raney has a "box key" that allows him access to all areas of all firehouses. It is a universal key.

35.     On October 24, 2017, at approximately 8:30pm, Jane Doe 1 took her boots off and was hoping to catch some sleep in the private room designated for the PIC.

36.     The door was closed and the lights were off.

37.     Raney used his universal box key to enter the firehouse and subsequently walk into the private room unannounced and uninvited.

38.     He walked in, did not turn on the light, stood in front of the door, and said, "I see you are laying down." This caused Jane Doe 1 to immediately sit up. He took a step towards Jane Doe 1 blocking her path to the door and wall light switch. Jane Doe 1 was able to shimmy down the bed and turn on the desk light. Jane Doe 1 told him, "You have to have the lights on and you need to open the door."

39.     He continued to block her path to the door and the light switch. Jane Doe 1 took a step back, pulled her right foot back, and prepared to defend herself.

40. Jane Doe 1 again repeated that he needed to open the door and turn the light on. She feared she would be sexually assaulted.

41. Raney discussed non-work related topics, and took a step forward, which caused Jane Doe 1 to take a defensive stance.

42. Jane Doe 1 feared for her safety.

43. Then, he said, "Maybe I should leave." Jane Doe 1 did not respond and he continued to initiate small talk. Finally, he left.

44. On October 29, 2017, Jane Doe 1 told Field Chief Robin Alvarez about the incident and she took it up the chain of command.

45. On October 30, 2017, Field Chief Robin Alvarez told EMS Fire Commissioner Mary Sheridan about the incident.

46. Four days following the incident in the private room, on October 28, 2017, Raney subjected Jane Doe 1 to retaliation for not accepting his advances.

47. A mass drill of approximately 100 people was being conducted. Multiple exempt-ranks, as well as the Commissioner of EMS, Mary Sheridan, had instructed Jane Doe 1 that her ambulance would not be a part of the drill.

48. Jane Doe 1 and her ambulance were to be stationed close to the actual drill in case any firefighter was injured or a "real-world emergency."

49. Raney was the field chief conducting the drill, and he called Jane Doe 1's ambulance over the radio.

50. She answered the call and told him their ambulance was not a part of the drill, and over the radio (where all other firefighters and medics involved, and all in command would hear) he

berated Jane Doe 1 in a harsh tone stating that she was not to question him and to do as she was told.

51.     FC John Genova noticed Raney's berating and approached Jane Doe 1 after the debriefing and said, "Raney was really harsh to you. I felt like that was uncalled for."

52.     Later that same day, October 28, 2017, in another act of retaliation, Raney showed up on site when Jane Doe 1 was responding to a four-car crash on Interstate 90/94.

53.     Jane Doe 1 was in the ambulance with FPM Brendan Brigade dealing with a patient, when Raney entered the ambulance, started yelling at her for the earlier incident at the drill. Raney stated, "When you don't do what you're told, you will have charges of insubordination."

54.     After Jane Doe 1 explained that Commissioner Sheridan had told her that her ambulance was not a part of the drill, Raney yelled at her and slammed the side door of the ambulance as he left. FPM Brendan Brigade and the patient witnessed this.

55.     FPM Brigade asked Jane Doe 1 why Raney was being so hostile.

56.     On November 5, 2017, Jane Doe 1 was assigned to Ambulance 63 with candidate Emily Amro. As a candidate, Amro was a subordinate to Jane Doe 1, who is a PIC. This assignment was to allegedly protect Jane Doe 1 from any accidental "run-ins" with FC Raney.

57.     On November 9, 2017, Assistant Deputy Chief Paramedic (ADCP) Zaentz and Field Chief Paramedic ("FCP") Fitzmaurice brought Amro and Jane Doe 1 in for counsel.

58.     Zaentz and Fitzmaurice told Amro that Jane Doe 1 had made a complaint of sexual harassment against Raney. Zaentz, in front of Amro, told Jane Doe 1 that she should seek help by an outside source. He recommended that Jane Doe 1 see a group of therapists with whom he was familiar.  He reiterated how this type of situation may be hard to deal with on one's own and that reaching out to receive mental help would be justifiable.

59.    On November 14, 2017, the City of Chicago Department of Human Resources EEO ("City's EEO") contacted Jane Doe 1 to schedule a meeting.

60.    EEO Investigator Yolanda Carrillo stated that the earliest they could meet with Jane Doe 1 was December 6, 2017. Jane Doe 1 asked for an earlier date, and the meeting was scheduled for November 29, 2017.

61.    On November 15, 2017, counsel for Jane Doe 1 sent the City a demand letter requesting Raney be put on paid administrative leave pending any alleged investigation, as per CFD policy. This request was ignored.

62.    When Raney was not put on paid administrative leave, Jane Doe 1 sent a request to Adrienne Bryant that she be put on paid administrative leave because she feared for her safety. Ms. Bryant never responded to Jane Doe 1's request.

63.    On November 26, 2017, Amro called Jane Doe 1 the day after they worked together on her personal cell phone. She told Jane Doe 1 to "just leave" her ambulance. Amro stated it is "not fair" that Jane Doe 1 was her partner on Ambulance 63 while "there are others that need Fitz [Fitzmaurice] to protect them and that would not be you!" Amro became hostile and yelled at Jane Doe 1 and did not allow her to respond to her hysterical statements. Amro ended the call by hanging up on Jane Doe 1.

64.    On November 29, 2017, at 7:20 AM Jane Doe 1's shift began with Amro. Despite needing to work together on the same ambulance, Amro initially would not speak to Jane Doe 1 and insisted that Jane Doe 1 leave *her* ambulance immediately.

65.    Amro began to scream and posture while leaning into Jane Doe 1's personal space and pointed her finger two inches from her face. Amro hysterically made these hostile, retaliatory statements:

10

a. "You are not the boss of me."

b. "You cannot tell me what to do."

c. "It's not fair that you are here."

d. "Stay away from me."

e. "You are clouded and Sandy (Cheatham) says you can't make decisions."

f. "How dare you come to this area under Fitz to protect you when there are others who need to be protected?"

g. "You are a liar and I can prove it."

h. "This is my ambulance, not yours."

i. "You need to leave, I do not want you here."

j. "Everyone else is right; you need to go out on medical."

k. "You are not emotionally stable."

l. "Why don't you just go call someone and complain?"

66.    Shortly thereafter, Jane Doe 1 was transported to a meeting with the City of Chicago's Department of Human Resources to discuss her complaint against Raney.

67.    The meeting lasted five hours.

68.    Following the five-hour meeting with the City of Chicago's Department of Human Resources, Jane Doe 1 was then ordered to go to a mediation session with Assistant Deputy Chief Paramedic ("ADCP") Zaentz and Amro.

69.    At this meeting, Amro accused Jane Doe 1 of being a liar. ADCP Zaentz admitted that Amro has accused Jane Doe 1 of having clouded judgment and not being of sound mind.

70.    Zaentz did not correct Amro for her hostility or retaliatory comments. Zaentz instructed Amro and Jane Doe 1 to drive to a nearby hospital, not to speak to one another, and trade partners for the remainder of the shift.

71.    Following the meeting, Zaentz reassigned Jane Doe 1, not Amro, to a different ambulance with Tim Pantera.

11

72.     Pantera is a close friend of Zaentz, and it is Jane Doe 1's belief that Pantera had been assigned to gather evidence against her and let her know she is being watched due to her complaint against Raney.

73.     Jane Doe 1 also faced retaliation from Anamar Hernandez, a fellow Paramedic in Charge. On January 16, 2018, Jane Doe 1 responded to a car accident where five people were injured. Hernandez performed the triage.

74.     Jane Doe 1 arrived on scene ready to take a patient. Jane Doe 1 asked Hernandez, "What do you need me to do?" as she would always ask triage what she should do or who she should take to the hospital.

75.     Hernandez heard Jane Doe 1 and turned her back. She never responded. Jane Doe 1 had to ask someone else.

76.     Jane Doe 1 believed that Hernandez's conduct was retaliatory and put patient care at issue.  At this point, Jane Doe 1 determined that she could no longer work on shift EMS 3 because the retaliation she faced placed patients at risk of inferior treatment.

77.     Due to the retaliation she faced from City of Chicago employees, Jane Doe 1 requested a shift change from EMS 3 to EMS 2.

78.     Jane Doe 1 started EMS 2 on January 31, 2018.

79.     Based on information and belief, female employees of the City of Chicago had complained about Raney's sexually harassing behavior prior to Jane Doe 1's complaints, yet the City failed to protect its female employees.

80.     Based on information and belief, after early complaints from other women were received about Raney's sexually harassing behavior, the City promoted him.

## **CLAIMS FOR RELIEF**

I. **Sexual Harassment – Hostile Work Environment under Title VII
(42 U.S.C. §§ 2000e-2)**

81. Jane Doe 1 re-alleges Paragraphs 1-80 and incorporates them as though fully set forth herein as Paragraph 81.

82. Jane Doe 1 found Raney's advances offensive and rejected them.

83. Raney's conduct at issue was based on sex.

84. This harassment unreasonably interfered with Jane Doe 1's work performance by creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being.

85. This harassment was so severe or pervasive as to alter the conditions of Jane Doe 1's employment and create an abusive working environment.

86. This harassment was both objectively and subjectively offensive.

87. At all times relevant to the Complaint, Raney has had authority to take tangible employment actions against Jane Doe 1, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

II. **Sexual Harassment – Hostile Work Environment under the IHRA
(775 ILCS 5/2-102(D))**

88. Jane Doe 1 re-alleges Paragraphs 1-87 and incorporates them as though fully set forth herein as Paragraph 88.

III. **Sexual Harassment– Quid Pro Quo Under Title VII (42 U.S.C. §§ 2000e-2)**

89. Jane Doe 1 re-alleges Paragraphs 1-80 and incorporates them as though fully set forth herein as Paragraph 89.

90. Jane Doe 1 is a member of a protected group.

91.     Jane Doe 1 found Raney's sexual advances offensive and rejected them.

92.     Raney's harassment of Jane Doe 1 was sexually motivated.

93.     Jane Doe 1 took Raney's sexual advances and requests for sex, as well as the retaliation

from her rejection of his advances, to mean that providing sex to Raney was a term or condition

of her employment.

94.     Jane Doe 1's reaction to Raney's advances affected tangible aspects of her employment.

95.     At all times relevant to the Complaint, Raney was acting on behalf of The City of

Chicago.

**IV.     Sexual Harassment– Quid Pro Quo Under IHRA (775 ILCS 5/2 102(D))**

96.     Jane Doe 1 re-alleges Paragraphs 1-80, 89-95 and incorporates them as though fully set

forth herein as Paragraph 96.

**V.     Retaliation for Reporting/Opposing Sexual Harassment in Violation of Title VII
        (42 U.S.C. §§ 2000e-2)**

97.     Jane Doe 1 re-alleges Paragraphs 1-80 and incorporates them as though fully set forth

herein as Paragraph 97.

98.     Jane Doe 1 made her first report of Raney's sexually harassing conduct on October 16,

2017, to Paramedic In Charge, her superior, TJ Faizi. She further reported Raney's sexually

harassing conduct on October 29, 2017, to Field Chief Robin Alvarez.

99.     At all times, Jane Doe 1 met the legitimate expectations of her employer, the City.

100.    These adverse employment actions (e.g. Raney's physically threatening entry into the

private sleeping quarters, his discipline of her in front of others, the CFD's refusal to put him on

administrative leave or take away his universal box key, the CFD's refusal to place Jane Doe 1

on paid administrative leave because she feared for her safety as long as Raney had the universal

box key, assignment of candidate Amro and her verbally abusive conduct toward Jane Doe 1,

14

assignment to a less desirable ambulance with Pantera, and being forced to change shifts because the retaliation put patient care at issue) followed Jane Doe 1's complaints of sexual harassment within a short period of time, thereby raising an inference of retaliatory motivation.

101.    Jane Doe 1 was treated less favorably than other similarly situated employees who did not engage in the statutorily protected activity of complaining about sexual harassment.

### VI.    Retaliation for Reporting/Opposing Sexual Harassment in Violation of IHRA (775 ILCS 5/6 - 101(A))

102.    Jane Doe 1 re-alleges Paragraphs 1-80, 97-101 and incorporates them as though fully set forth herein as Paragraph 102.

### VII.    Gender Discrimination (Disparate Treatment) in Violation of Title VII (42 U.S.C. §§ 2000e-2)

103.    Jane Doe 1 re-alleges Paragraphs 1-80 and incorporates them as though fully set forth herein as Paragraph 103.

104.    Respondent discriminated against Jane Doe 1 due to her gender by subjecting her, and other female employees, to disparate treatment and unequal terms and conditions of employment by:

  a.   Subjecting Jane Doe 1 to a pattern or practice of hostile work environment due to sexual harassment;

  b.   Retaliating against Jane Doe 1 for reporting acts of sexual harassment;

  c.   Allowing male superiors to berate Jane Doe 1 while not subjecting male employees to similar treatment;

  d.   By assigning Jane Doe 1 a cadet who verbally abused her in spite of the fact that she was her superior;

  e.   Denying Jane Doe 1's request that Raney be placed on administrative leave;

  f.   Denying Jane Doe 1's request for paid administrative leave;

  g.   Failing to timely or adequately address Jane Doe 1's complaints;

  h.   Subjecting Jane Doe 1 and other women, to Raney's conduct when complaints had been made about him prior and CFD failed to act;

      i.   By promoting Raney, when there had been complaints against him, yet subjecting Jane Doe 1 along with other women to adverse employment actions when they complained;

      j.   Having received complaints about Raney prior to Jane Doe 1's, yet had kept him employed;

      k.   By having a zero-tolerance policy of violence, but not enforcing it when it came to females' complaints of sexual harassment and hostile work environment against males;

      l.   Assigning Jane Doe 1 to a less desirable ambulance with Pantera;

      m.   Forcing Jane Doe 1 to change shifts because the retaliation put patient care at issue.

105.    Respondent had no sexual harassment training in place at the time these events took place, nor did it implement prompt remedial measures when notified of the employment practices violating federal and state employment laws.

106.    At all times, Jane Doe 1 performed her job according to CFD's legitimate expectations.

107.    CFD treated similarly situated male employees outside the protected class more favorably.

### VIII.    Gender Discrimination (Disparate Treatment) in Violation of IHRA (775 ILCS 5/2-102(A))

108.    Jane Doe 1 re-alleges Paragraphs 1-80, 103-107 and incorporates them as though fully set forth herein as Paragraph 108.

### JANE DOE 2

The following constitutes charges of discrimination against the City of Chicago. The causes of action included in this document:

- Sexual Harassment – Hostile Work Environment under Title VII
- Sexual Harassment – Hostile Work Environment under IHRA
- Sexual Harassment – Quid Pro Quo under Title VII
- Sexual Harassment – Quid Pro Quo under IHRA
- Retaliation for Reporting/Opposing Sexual Harassment under Title VII
- Retaliation for Reporting/Opposing Sexual Harassment under IHRA
- Gender Discrimination (Disparate Treatment) in Violation of Title VII
- Gender Discrimination (Disparate Treatment) in Violation of IHRA

16

## **FACTUAL ALLEGATIONS**

109.    Jane Doe 2 is a paramedic with the Chicago Fire Department. She has worked for the CFD since August 1, 2002.

110.    In late 2013, Jane Doe 2 dated CFD firefighter George Olifer for approximately 3 months.

111.    Upon information and belief, Olifer works as both a firefighter ("FF") and an emergency medical technician ("EMT").

112.    Jane Doe 2 ended the relationship in February 2014. Olifer sent Jane Doe 2 numerous text messages to try to reconcile. These texts included threats of suicide. At the time she ended the relationship, he started driving by Jane Doe 2's house repeatedly.

113.    Olifer posted a picture of Jane Doe 2 in a bra and underwear on Facebook for her family and co-workers to see with a sexual comment about her. Jane Doe 2 blocked him from her social media and telephone.

114.    Approximately one month after breaking off the relationship, on March 19, 2014, Jane Doe 2 received a nasty, degrading email from Olifer.

115.    This conduct was motivated by her gender and not their former relationship.

116.    Jane Doe 2 went to Internal Affairs Division (IAD) and spoke to Barbara Bennett (IAD investigator) about the continued harassment.

117.    She told Jane Doe 2 that because Olifer was doing these things outside of work, they could not do anything about it. She told Jane Doe 2 that if she was really concerned she should get an order of protection.

118.    In mid-March 2014, Jane Doe 2 filed an order of protection against Olifer in Cook County. The judge continued the case and requested that Olifer be present in court at the next hearing.

119.    On March 30, 2014, Jane Doe 2 found out that she was pregnant with her now-husband's child. Jane Doe 2 notified the department and went out on leave.

120.    Shortly thereafter, Jane Doe 2 received a phone call from Elizabeth Crowe, a licensed clinical social worker, who is known as CFD's Social Worker. Crowe told Jane Doe 2 that she had been counseling Olifer and that he was in a "better place" and that Jane Doe 2 should "forego the legal route" because "something like this could ruin his career."

121.    Jane Doe 2 did not pursue the order of protection due to Crowe's guidance regarding the matter. She trusted Crowe's assertion that that he would stop harassing her.

122.    On May 13, 2014, Jane Doe 2 had a CFD medical appointment for her pregnancy. IAD investigator Nadine Skelly showed up during her medical appointment and interviewed her about her harassment claims.

123.    Jane Doe 2 told her everything that had happened up to that point.

124.    Skelly asked Jane Doe 2 if she had heard from Olifer since she spoke to Crowe about the order of protection. Jane Doe 2 told her she had not. Skelly told her they would conclude their investigation and notify her of the outcome.

125.    On June 7, 2014, Jane Doe 2 suffered a miscarriage.

126.    On June 28, 2014, Jane Doe 2 returned to duty after the miscarriage. Jane Doe 2 received a call from PIC Marco Flores asking her if she was filing harassment charges against him.

127.    He explained that he had been talking to PIC Nora Duran, and Duran told him that she overheard a conversation regarding Jane Doe 2 and an order of protection against someone.

128.    Flores told Jane Doe 2 he thought it was against him because PIC Nora Duran heard her make a comment once about how he was always telling Jane Doe 2 about his problems.

129.    Flores told Jane Doe 2 that Duran went to Crowe out of concern for Flores getting in trouble for talking to Jane Doe 2. He further stated Duran told Flores that Crowe confirmed Jane Doe 2 had filed for an order of protection.

130.    Jane Doe 2 told Flores that Duran's facts were wrong.

131.    Jane Doe 2 was so upset by Crowe's breach of confidentiality that she requested to go out of service and meet with her Field Chief John Genova and Assistant Deputy Chief Paramedic (ADCP) Daniel Gariti.

132.    They met at Field Division North and Jane Doe 2 told them she was upset by this accusation from Flores because it showed Crowe breached confidentiality and was creating rumors about her. Jane Doe 2 told them that the stress of losing the baby was ongoing and this was uncalled for.

133.    At that time, FC Genova and ADCP Gariti called Duran on the phone and placed the call on speakerphone. Duran did not know Jane Doe 2 could hear the conversation.

134.    ADCP Gariti asked Duran about the conversation with Flores. She responded by saying that she had heard that Jane Doe 2 filed harassment charges and a restraining order against someone. Because of a comment Jane Doe 2 made about Flores, Duran assumed it was against him.

135.    Duran admitted she went to Crowe out of concern for Flores, and Crowe said to her, "Oh, [Jane Doe 2]! She thinks everyone is stalking her these days!"

136.    Duran said she took this to mean that the information was correct about Flores. She further explained that it was her obligation as Flores' friend in the Latino community to inform him.

137.    At this point, Jane Doe 2 was in tears and humiliated that Crowe, a licensed social worker who she had trusted with her decision to not pursue an order of protection against Olifer, breached confidentiality and besmirched her reputation in front of a co-worker.

138.    ADCP Gariti encouraged Jane Doe 2 to file charges against Crowe at this time, but she was terrified that there would be retaliation from the department.

139.    Out of fear of retaliation, Jane Doe 2 chose to deal with the humiliation privately so long as the issue with Olifer was being resolved.

140.    The weekend of July 19, 2014, Jane Doe 2 received more texts from Olifer. She did not respond and re-blocked his number.

141.    On October 12, 2014, Jane Doe 2 received another text from Olifer. He told Jane Doe 2 not to get a restraining order against him and then mentioned the miscarriage. She again did not respond and blocked his number again.

142.    On November 1, 2014, Jane Doe 2 transferred to Ambulance 42 in the first district.

143.    Jane Doe 2 did not have contact with Olifer for two years because of the transfer.

144.    On October 1, 2016, CFD assigned Jane Doe 2 a new firehouse, firehouse No. E119, T55, A39 ("E119/T55"). Jane Doe 2 was assigned to Ambulance 39.

145.    On October 3, 2016, Jane Doe 2 took her first shift at the new assignment. As she arrived, Olifer was standing there. He told Jane Doe 2 he was "detailed" at that firehouse all the time. He then said, "How are those ladies of yours?" in a threatening tone referring to Jane Doe 2's daughters.

146.     Jane Doe 2 avoided Olifer and went to the female-only sleeping area.

147.     E119/T55 is one of the few firehouses in the CFD that has a female-only sleeping area.

148.     Jane Doe 2, then, called her husband, also a paramedic, who in turn called his Battalion Chief.

149.     The Battalion Chief said that he would make a note in Manpower stating that Olifer is not to be assigned to firehouse E119/T55.

150.     Based on information and belief, Olifer learned of the Battalion Chief's note in Manpower.

151.     During one of his details at E119/T55, Olifer spoke to FF Dennis Ramoska and said that he would take every opportunity to work at Jane Doe 2's firehouse to "fuck with her" and remarked that he may put in a transfer to Jane Doe 2's firehouse for that same purpose.

152.     On November 10, 2016, when Jane Doe 2 reported for duty, Olifer was also reporting for duty. Jane Doe 2 sent a text message to her husband letting him know that Olifer was scheduled to work at E119/T55 with her.

153.     Jane Doe 2 made no contact with anyone at the firehouse and went to the back of the ambulance to begin a check of the equipment. Jane Doe 2 heard the Marshall Line ring. The call was for Battalion Chief ("BC") Mulroe, the Chief overseeing the firehouse that day.

154.     A few minutes later, Jane Doe 2 heard Olifer screaming, "This is bullshit! This is racism! That fucking bitch did this!" Jane Doe 2 heard him scream all the way to the parking lot. After the screaming stopped, Jane Doe 2 got out of the ambulance and spoke to Lieutenant Rick Brown and BC Mulroe.

155. BC Mulroe told Jane Doe 2 that he received a call from Manpower that Engine 11 needed an EMT and that Brown told Olifer to report to Engine 11 which is when all of the screaming began.

156. Lt. Brown stated that Olifer switched his own detail with FF Sullivan to come to E119/T55.

157. Jane Doe 2 took this to mean Olifer was going out of his way to take details at her firehouse.

158. During roll call, Lt. Brown mentioned sexual harassment and violence in the workplace in front of all the on-duty members. Jane Doe 2 was embarrassed, as they all know it was being discussed because of her and the incident with Olifer.

159. BC Mulroe told Lt. Brown to write an incident report. Brown recorded this in the firehouse journal. He noted, "Incident case report filled out w/ 1 copy to BNII, 1 copy text to Elizabeth Crowe per her request, incident case report emailed to Elizabeth Crowe also…Incident case report completed and sent through chain."

160. Lt. Brown wrote in the incident report:

> FF/EMT OLIFER (T44) FILE # 19740 REPORTED TO DUTY AT T55. FF SULLIVAN T44 FILE # 18942 WAS ORIGINALLY TO BE DETAILED ACCORDING TO TELESTAFF BUT FF/EMT OLIFER SHOWED UP INSTEAD. MANPOWER CALLED BN 11 AND TOLD HIM TO SEND FF/EMT OLIFER TO E11. FF/EMT OLIFER HAD A PRIOR INCIDENT WITH FPM [JANE DOE 2] WORKING ON A39 TODAY. SHE FEELS HER SAFETY IS THREATENED TO BE IN THE SAME HOUSE WITH FF/EMT OLIFER. THERE IS PAPERWORK WITH IAD REGARDING THE PRIOR INCIDENT. DEPT. OF HUMAN RELATIONS COORDINATOR ELIZABETH CROWE HAS BEEN NOTIFIED OF TODAY'S INCIDENT. WE ARE REQUESTING FF/EMT OLIFER NOT BE DETAILED TO E119'S QUARTERS FOR THE SAFETY OF FPM [JANE DOE 2].

161. Jane Doe 2 took Olifer's conduct to mean that he was making good on his threat to take every detail possible at her firehouse to place her in imminent fear.

162.    That same day, November 10, 2016, Jane Doe 2 made a complaint (Form 2) to Juan Hernandez, Deputy Chief of the CFD.

163.    Jane Doe 2 wrote to Deputy Chief Hernandez stating that she did not feel safe working in the same firehouse as Olifer due to the events with the order of protection and her complaints to IAD.

164.    Jane Doe 2 wrote to Deputy Chief Hernandez stating, "I feel these comments and subsequent self-detailing are aggressive actions towards me in order to create an uncomfortable and unharmonious work environment as described in the CFD Code of Conduct Gen. Order 13-007."

165.    Up until this point, it had not been an issue because they were not in the same district. Now, Jane Doe 2 was assigned A39, the same district as Olifer.

166.    Finally, Jane Doe 2 called Maggie Murphy, a female union steward and Ambulance Commander to ask her advice about what to do because Deputy Chief Juan Hernandez was not responding to her serious complaint.

167.    To this day, Jane Doe 2 has not received a response from Deputy Chief Juan Hernandez.

168.    Maggie Murphy said she would alert them.

169.    On December 6, 2016, Jane Doe 2 reported for duty. Jane Doe 2 received a Marshall Line phone call from 4-5-3 Field Chief Larry Del Dotto instructing her to report to IAD that morning. Jane Doe 2 called Joe Davillo, Director of EMS, FF Union Local 2, and asked him to be her union counsel at the meeting. He agreed and met her at IAD later than morning. Jane Doe 2's statement was taken by IAD's Skelly and Eva LaSousa.

170.    They told Jane Doe 2 that no IR (Incident Report or reprimand) had been issued to Olifer, but she should "be vigilant" in the parking lot of the firehouse in case he shows up, and she should call the police if he does.

171.    They instructed Jane Doe 2 to go to the 16th District Police Department to file a report.

172.    LaSousa asked Jane Doe 2 if her husband has attempted to contact Olifer saying that "back in the day, that's how these types of things were handled. You could just take someone outside and set them straight."

173.    Jane Doe 2 informed her that her husband would not conduct himself in that manner.

174.    Jane Doe 2, then, went to the 16th District Police Department and filed a report with permission of 4-5-3, her field chief.

175.    Later that afternoon, at Community First Medical Center, Jane Doe 2 began experiencing gastrointestinal symptoms brought on by emotional distress.

176.    Jane Doe 2 was transported by CFD to Resurrection Medical Center.

177.    On December 9, 2016, Jane Doe 2 reported to Medical Section for a follow up to her lay up from gastrointestinal distress on duty December 6, 2016.

178.    Deputy District Chief of Medical Section Edgar Ignacio and Roula McCarthy met with Jane Doe 2 and apologized.

179.    They told Jane Doe 2 they were going to take care of it and look to terminate Olifer. Chief Ignacio ordered Jane Doe 2 to speak to Adrianne Bryant, Sexual Harassment Liaison and HR Director.

180.    That same day, Adrianne Bryant told Jane Doe 2 that she was not sure what she could do for her because she filed with a different chain of command.

181.    Bryant told Jane Doe 2 that it will be handled and she would call her personally.

182.    She called Jane Doe 2 that evening with no new information. Jane Doe 2 never heard from her after that.

183.    On June 24, 2017, Jane Doe 2 was served with allegations of making fraudulent allegations of harassment IR #17-0427.

184.    The IR stated, "It is alleged that FPM [Jane Doe 2] made fraudulent allegations of harassment against her ex-boyfriend and CFD member, FF/EMT George Olifer."

185.    It was signed by IAD Investigator Coco and delivered by Field Chief Jeff Larson. Jane Doe 2 was ordered to sign receipt of these charges.

186.    Jane Doe 2 worked under extreme stress after delivery of the charges.

187.    On July 6, 2017, Jane Doe 2 was interviewed by IAD Investigators Coco and LaSousa.

188.    Coco told Jane Doe 2 that "people work with their exes all the time" and nobody had backed up her story.

189.    It was revealed during the meeting that IAD did not call any of Jane Doe 2's witnesses including Capt. Jurowicz and Dennis Ramoska.

190.    Olifer had previously told Ramoska that he was going to "fuck with" Jane Doe 2 and Jurowicz witnessed Olifer screaming at her, calling her, a "fucking bitch."

191.    Jane Doe 2 was informed that Olifer filed a grievance about his ban to work at her firehouse. This was put to a union vote and the union voted to lift the ban.

192.    Maggie Murphy was present during the grievance hearing.

193.    FF Brandon Dunn told Jane Doe 2 that Olifer was boasting and showing the email from Chief Janice Hogan lifting the ban around the firehouse.

194.    On October 16, 2017, Jane Doe 2 received charges from the City of Chicago Fire Department from Steven Malec, Assistant Commissioner, IAD to: Janice Hogan, Deputy Chief,

Bureau of Administrative Services, "Charges & Specifications against FPM [Jane Doe 2] File #19044, Ambulance #39" IR # 17-0427."

195. The letter stated:

It is charged that FPM [Jane Doe 2] made false allegations against another member, to the detriment of that member, and that FPM [Jane Doe 2] continued to lie to IAD investigators during the investigation in an attempt to justify her false allegations against the member she accused of threatening and harassing her.

Charges

Violation of the following section of the code of Professional Conduct, Rules and Regulations, Practice and Procedures of the Fire Department of the City of Chicago, in force and effect on April 17, 2013.

Sections

2.01 Conduct in violation of the Code of Professional Conduct;
2.08 Disseminating false rumors, or information, regarding a member of the department to the detriment of such member;
2.12 Commission of any act prohibited by the Personnel Code Rule XVIII: of the Code of the City of Chicago, or Department General and Special Orders or Directives or Bureau Orders;
2.15 Any conduct or action taken to use an official action for personal gain or influence;
2.29 Taking a false official report.

196. 4-5-3 Field Chief Jeff Larson delivered the charges.

197. Jane Doe 2 was required to sign a receipt of these charges.

198. On November 23, 2017, Thanksgiving Day, Jane Doe 2 received a 906 (Charges Not Sustained). To this day, Jane Doe 2 has no official explanation from the department on the allegations.

199. On December 21, 2017, while on her way to report for duty at E119/T55, Jane Doe 2 received a phone call at 0623 hours from PIC Woznicki. She instructed Jane Doe 2 to report to E119/T55 firehouse, enter through the front of the building and proceed immediately to Battalion Chief 11's quarters.

200. PIC Woznicki then informed Jane Doe 2 that Olifer was already at E119/T55 firehouse for a tour of duty beginning at 0700 hours.

201. Jane Doe 2 parked in the designated parking lot and came in to Battalion Chief 11's Quarters. Battalion Chief Matt Dowdall was sitting at his desk and talking on the phone. He motioned for Jane Doe 2 to sit down in the other chair in his office. At this time, Woznicki and FPM Rick Beaudoin entered his office. Jane Doe 2 was relieving FPM Beaudoin of his tour of duty.

202. FPM Beaudoin could see that Jane Doe 2 was upset and offered condolences for the continued stress she was going through due to the situation. FPM Beaudoin reported the conditions of A39 to Jane Doe 2 and left the room.

203. At this time, Chief Dowdall was off the phone and began addressing Woznicki and Jane Doe 2 regarding the situation. He related to Jane Doe 2 that he was informed of the ongoing issue regarding Olifer, had seen the Incident Case Report from Lt. Brown, as well as, the T55 journal entries from November 10, 2016.

204. Chief Dowdall stated that based on those two pieces of paper, he made a decision to change Olifer's detail from T55 to E108. He stated that it was clear to him that Olifer and Jane Doe 2 should not be quartered in the same firehouse for the same tour of duty. He mentioned that this would be best for the fire department.

205. Chief Dowdall stated that Jane Doe 2 would stay in her assigned spot and Olifer would be placed somewhere else with a variance needing to be filled.

206. Chief Dowdall informed Jane Doe 2 that he had contacted and received approval from Deputy District Chief Dietz, as well as Manpower Central. He then told them that he would be informing Olifer of this change and instructed Jane Doe 2 to stay in his office while he did so.

207.    Chief Dowdall returned and closed the door to his office, as there were now 6 or 7 members on the apparatus floor making noise during morning activities. He told Woznicki and Jane Doe 2 that he had told Olifer about the change in detail and instructed him to report for duty at another firehouse, E108.

208.    Chief Dowdall told them that Olifer's response to this change was, "I know what this is about," at which point Chief Dowdall told him, "Okay."

209.    Chief Dowdall then went on to explain to Woznicki and Jane Doe 2 that they had the right to a safe and harmonious work environment.

210.    During this conversation, Olifer pounded on the door and came in, saying "Oh, excuse me! Excuse me!" He made direct eye contact with Jane Doe 2 and then with Woznicki.

211.    Woznicki stepped in front of Jane Doe 2's chair. Later she told Jane Doe 2 it was to stop Olifer from lunging at her.

212.    Olifer then exited the room and shut the door.

213.    Olifer's conduct was harassing, intimidating, and humiliating.

214.    Jane Doe 2 feared for her physical safety. She was crying and shaking after the encounter.

215.    Chief Dowdall told Jane Doe 2 that he believed Olifer did this to make contact with her and confirmed with another lieutenant that Olifer left the building.

216.    Once confirmed, Jane Doe 2 exited Chief Dowdall's office and started her tour of duty.

217.    Woznicki informed Field Chief John Harding about this incident.

218.    At 0745 hours that day, FC Harding met Jane Doe 2's ambulance at Resurrection Hospital following an ambulance run. He inquired as to whether she wanted to see CFD Social Worker Crowe.

219.    FC Harding offered to put Jane Doe 2 on paid leave for stress. Jane Doe 2 told him that she could perform her duties as usual and would reach out to her personal counselor, because she had no faith in Crowe's ability to maintain confidentiality.

220.    Jane Doe 2 informed FC Harding that she would submit a Form 2 regarding the day's events. He told her he would pick it up and submit it through the chain of command at her request.

221.    At approximately, 2200 hours, Chief Dowdall gave Jane Doe 2 a copy of his Incident Case Report and informed her that he had a meeting with Olifer and E108 Captain Weel.

222.    Chief Dowdall stated that Olifer claimed that he believed that he and Jane Doe 2  "got along" and did not understand why he was being detailed away from T55.

223.    Chief Dowdall stated Olifer showed him an email from Deputy Chief Janice Hogan which showed Olifer did not have any restrictions on where he could be detailed.

224.    Chief Dowdall ended the conversation by saying he would submit his incident case report along with Lt. Brown's November 10, 2016, incident case report along with copies of the journal entries from November 10, 2016, so there was no confusion about why Olifer was detailed away from T55.

225.    At 0645 hours on December 22, 2017, Chief Dowdall informed Jane Doe 2 that he received a text message from Fire Fighter's Local 2 Union representative Paul Stamper at approximately 2230 hours on December 21, 2017, informing him that Olifer has written a Form 2 alleging harassment and discrimination, as well as filing a grievance with Local 2.

226.    Chief Dowdall informed Jane Doe 2 that they would be getting called to IAD to be interviewed on this matter.

227.    As of the filing of this Complaint, nothing has been resolved.

**Claims for Relief**

I. **Sexual Harassment – Hostile Work Environment under Title VII
(42 U.S.C. §§ 2000e-2)**

228.    Jane Doe 2 re-alleges Paragraphs 1-11, 109-227 and incorporates them as though fully set

forth herein as Paragraph 228.

229.    Jane Doe 2 found Olifer's advances offensive and rejected them.

230.    Olifer's conduct at issue was based on sex.

231.    This harassment unreasonably interfered with Jane Doe 2's work performance by

creating an intimidating, hostile, or offensive working environment that seriously affected her

psychological well-being.

232.    This harassment was so severe or pervasive as to alter the conditions of Jane Doe 2's

employment and create an abusive working environment.

233.    This harassment was both objectively and subjectively offensive.

234.    The conduct Jane Doe 2 experienced at the hands of the CFD constitutes a continuing

violation of Title VII.

235.    The CFD knew or should have known of the harassment and failed to act to remedy the

harassment.

II. **Sexual Harassment – Hostile Work Environment under the IHRA
(775 ILCS 5/2 102(D))**

236.    Jane Doe 2 re-alleges Paragraphs 1-11, 109-227 and incorporates them as though fully set

forth herein as Paragraph 221.

III. **Sexual Harassment– Quid Pro Quo Under Title VII (42 U.S.C. §§ 2000e-2)**

237.    Jane Doe 2 re-alleges Paragraphs 1-11, 109-227 and incorporates them as though fully set

forth herein as Paragraph 237.

238. Jane Doe 2 is a member of a protected group.

239. Jane Doe 2 found Olifer's sexual advances offensive and rejected them.

240. Olifer's harassment of Jane Doe 2 was sexually motivated.

241. Jane Doe 2 took Olifer's sexual advances, as well as the retaliation from her rejection of his advances, to mean that providing sex to Olifer was a term or condition of her employment.

242. Jane Doe 2's reaction to Olifer's advances affected tangible aspects of her employment.

243. At all times relevant to the Complaint, Olifer was acting on behalf of The City of Chicago.

### IV. Sexual Harassment– Quid Pro Quo Under IHRA (775 ILCS 5/2-102(D))

244. Jane Doe 2 re-alleges Paragraphs 1-11, 109-227, 237-243 and incorporates them as though fully set forth herein as Paragraph 244.

### V. Retaliation for Reporting/Opposing Sexual Harassment in Violation of Title VII (42 U.S.C. §§ 2000e-2)

245. Jane Doe 2 re-alleges Paragraphs 1-11, 109-227 and incorporates them as though fully set forth herein as Paragraph 245.

246. Jane Doe 2 made her first report of Olifer's sexually harassing conduct in early 2014, when she filed her order of protection. Jane Doe 2 brought this to the attention of social worker Crowe.

247. In spite of making her complaint of sexual harassment, the City did nothing.

248. Instead of protecting its female employee, the CFD retaliated against Jane Doe 2 by issuing a corrective notice for allegedly lying about Olifer's sexually harassing behavior and allowing Liz Crowe to disparage her in front of co-workers and breach confidentiality.

249. At all times, Jane Doe 2 met the legitimate expectations of her employer.

250.    These adverse employment actions (e.g. her IR stating that she had lied to investigators about her allegations against Olifer and lifting the ban against Olifer working at E119/T55) followed her complaints of sexual harassment within a short period of time, thereby raising an inference of retaliatory motivation.

251.    Jane Doe 2 was treated less favorably than other similarly situated employees who did not engage in the statutorily protected activity of complaining about sexual harassment.

## VI.    <u>Retaliation for Reporting/Opposing Sexual Harassment in Violation of IHRA (775 ILCS 5/6 - 101(A))</u>

252.    Jane Doe 2 re-alleges Paragraphs 1-11, 109-227, 245-251 and incorporates them as though fully set forth herein as Paragraph 252.

## VII.   <u>Gender Discrimination (Disparate Treatment) in Violation of Title VII (42 U.S.C. §§ 2000e-2)</u>

253.    Jane Doe 2 re-alleges Paragraphs 1-11, 109-227 and incorporates them as though fully set forth herein as Paragraph 253.

254.    CFD discriminated against Jane Doe 2 due to her gender by subjecting her, and other female employees, to disparate treatment and unequal terms and conditions of employment by:

    a.  Subjecting her to a pattern or practice of hostile work environment due to sexual harassment;

    b.  Retaliating against her for reporting acts of sexual harassment by making formal charges against her that stated that she lied about the alleged harassment;

    c.  Allowing male co-workers berate her and call her a "fucking bitch" while not subjecting male employees to similar treatment;

    d.  By lifting the ban on Olifer working at E119/T55;

    e.  By alleging that Jane Doe 2 lied about acts of sexual harassment;

    f.  By having a zero-tolerance policy of violence, but not enforcing it when it came to females' complaints of sexual harassment and hostile work environment based on sex against males.

255. Respondent had no sexual harassment training in place at the time these events took place, nor did it implement prompt remedial measures when notified of the employment practices violating state and federal law.

256. At all times, Jane Doe 2 performed her job according to CFD's legitimate expectations.

257. CFD treated similarly situated male employees outside the protected class more favorably.

**VIII.** **Gender Discrimination (Disparate Treatment) in Violation of IHRA (775 ILCS 5/2 102(A))**

258. Jane Doe 2 re-alleges Paragraphs 1-11, 109-227, 253-257 and incorporates them as though fully set forth herein as Paragraph 258.

## JANE DOE 3

The following constitutes charges of discrimination against the City of Chicago. The causes of action included in this document:

- Sexual Harassment – Hostile Work Environment under Title VII
- Sexual Harassment – Hostile Work Environment under IHRA
- Sexual Harassment – Quid Pro Quo under Title VII
- Sexual Harassment – Quid Pro Quo under IHRA
- Retaliation for Reporting/Opposing Sexual Harassment under Title VII
- Retaliation for Reporting/Opposing Sexual Harassment under IHRA
- Gender Discrimination (Disparate Treatment) in Violation of Title VII
- Gender Discrimination (Disparate Treatment) in Violation of IHRA

## FACTUAL ALLEGATIONS

259. Jane Doe 3 is a paramedic with the Chicago Fire Department. She has worked for the CFD since August 2014. Jane Doe 3 is currently a Paramedic-in-Charge.

260. Starting on April 22, 2017, to November 2017, Jane Doe 3 was subjected to sexual harassment by Ambulance Commander George Bedon, her superior.

261. At all times relevant to the Complaint, Bedon had authority to take tangible employment actions against Jane Doe 3, *i.e.*, to effect a significant change in employment status, such as

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

262.    On April 22, 2017, late into the night, at St. Joseph's Hospital in Chicago, Illinois, Jane Doe 3 went into the medic room to retrieve sheets/supplies for the ambulance.

263.    Bedon was sitting in the room at a computer opposite the supplies.

264.    After Jane Doe 3 entered the room, Bedon put his computer down, turned to face Jane Doe 3, and grabbed her.

265.    He pulled Jane Doe 3 towards him, grabbed her with two hands, and tried to kiss her with an open mouth.

266.    Jane Doe 3 told him, "No," and tried to get away and back up.

267.    Bedon kissed her and licked her face.

268.    Jane Doe 3 put her hands on his chest to push him off of her and he said, "Come on, you know you want it."

269.    Jane Doe 3 continued to physically and verbally resist his advances.

270.    Bedon grabbed Jane Doe 3's right wrist with his left hand and placed her hand on his erect penis.

271.    Jane Doe 3 grabbed his penis and twisted it very hard.

272.    It was at this point that he stopped and let her go.

273.    Shaken, Jane Doe 3 ran out of the room.

274.    Jane Doe 3 and Bedon worked together on the ambulance the rest of the night.

275.    Jane Doe 3 was afraid to tell anyone about it because Bedon was her boss, she was new, and she knew that women who complain of sexual harassment get mocked, humiliated, retaliated against, and their careers suffer as a result of complaining of sexual harassment at the CFD.

276.　During the summer of 2017, near the ambulance bay of Northwestern Hospital, Jane Doe 3 was working with Sal Dinolfo.

277.　In the ambulance bay, Bedon came up to Jane Doe 3 and tried to hug her. As he approached her, he opened his mouth and stuck his tongue out.

278.　Jane Doe 3 was able to back up in time to avoid his advance.

279.　He asked her, "What's wrong?" to which she replied, "I don't want you to touch me, hug me, or kiss me."

280.　Bedon said he was just asking for a cigarette.

281.　Jane Doe 3 gave him one, and he left the ambulance bay.

282.　After this incident, Bedon again tried to hug Jane Doe 3 at the printer counter at Northwestern Hospital. He was sitting at the computer when she entered and got out of his chair to hug her, and she told him, "I don't want to be touched."

283.　Bedon sat back down.

284.　On November 7, 2017, at Habetler Bowl between 10am-2pm at a party for the fourth shift, Bedon tried to hug Jane Doe 3.

285.　Jane Doe 3 again was able to step back in time to avoid his advances.

286.　Jane Doe 3 told him to never touch her.

287.　On November 8, 2017, Jane Doe 3 reported all of these events with Bedon to FC Laurie Timothy.

288.　FC Timothy told Jane Doe 3 to call Adrianne Bryant, Deputy Commissioner.

289.　Jane Doe 3 called that day and left a voicemail.

290.　Adrianne Bryant called her back and asked for a short version of what happened.

291.    Jane Doe 3 began to tell her the chain of events. After she finished telling about the St. Joseph's Hospital incident, Bryant told Jane Doe 3 to stop and sent her complaint to the City's EEO department.

292.    On November 30, 2017, Jane Doe 3 was interviewed by two of the City's EEO department investigators.

293.    During the interview, Jane Doe 3 cooperated with the investigation and gave the investigators all pertinent information related to her claim of repeated sexual harassment.

294.    At one point during the interview, Jane Doe 3 discussed a friend of hers who she had told about Bedon's harassment.

295.    After a brief break, investigators came back and threatened that if Jane Doe 3 did not identify her friend's name, she was not "cooperating with the investigation" and that she could be disciplined.

296.    The investigators continued to threaten insubordination despite the fact that Jane Doe 3 had fully disclosed the details of her claim and provided plenty of names for them to investigate.

297.    Respondent has failed to investigate Jane Doe 3's complaints of repeated sexual harassment.

298.    Based on information and belief, CFD had received prior complaints about Bedon's sexually harassing behavior, yet failed to protect its female employees from it.

299.    Based on information and belief, CFD promoted Bedon in spite of its knowledge of his sexually harassing behavior.

## **CLAIMS FOR RELIEF**

I.    **Sexual Harassment – Hostile Work Environment under Title VII
      (42 U.S.C. §§ 2000e-2)**

300.    Jane Doe 3 re-alleges Paragraphs 1-11, 259-299 and incorporates them as though fully set forth herein as Paragraph 300.

301.    Jane Doe 2 found Bedon's advances offensive and rejected them.

302.    Bedon's conduct at issue was based on sex.

303.    This harassment unreasonably interfered with Jane Doe 3's work performance by creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being.

304.    This harassment was so severe or pervasive as to alter the conditions of Jane Doe 3's employment and create an abusive working environment.

305.    This harassment was both objectively and subjectively offensive.

306.    At all times relevant to the Complaint, Bedon has had authority to take tangible employment actions against Jane Doe 1, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

**II.    Sexual Harassment – Hostile Work Environment under the IHRA (775 ILCS 5/2 102(D))**

307.    Jane Doe 3 re-alleges Paragraphs 1-11, 259-306 and incorporates them as though fully set forth herein as Paragraph 307.

**III.    Sexual Harassment– Quid Pro Quo Under Title VII (42 U.S.C. §§ 2000e-2)**

308.    Jane Doe 3 re-alleges Paragraphs 1-11, 259-299 and incorporates them as though fully set forth herein as Paragraph 308.

309.    Jane Doe 3 is a member of a protected group.

310.    Jane Doe 3 found Bedon's sexual advances offensive and rejected them.

311.    Bedon's harassment of Jane Doe 3 was sexually motivated.

312.     Jane Doe 3 took Bedon's sexual advances and requests for sex, as well as the retaliation

from her rejection of his advances, to mean that providing sex to Bedon was a term or condition

of her employment.

313.     Jane Doe 3's reaction to Bedon's advances affected tangible aspects of her employment.

314.     At all times relevant to the Complaint, Bedon was acting on behalf of The City of

Chicago.

### IV.     Sexual Harassment– Quid Pro Quo Under IHRA (775 ILCS 5/2 102(D))

315.     Jane Doe 3 re-alleges Paragraphs 1-11, 259-299, 308-314 and incorporates them as

though fully set forth herein as Paragraph 315.

### V.     Retaliation for Reporting/Opposing Sexual Harassment in Violation of Title VII (42 U.S.C. §§ 2000e-2)

316.     Jane Doe 3 re-alleges Paragraphs 1-11, 259-299 and incorporates them as though fully set

forth herein as Paragraph 316.

317.     Jane Doe 3 made her first report of Bedon's sexually harassing conduct on November 8,

2017, to FC Timothy.

318.     At all times, Jane Doe 3 met the legitimate expectations of her employer.

319.     Because Jane Doe 3 came forward with her complaints, the CFD has continually

threatened her with discipline. This has changed the terms and conditions of her employment

because her job has been continually threatened.

320.     This change in terms and conditions of employment is an adverse employment action that

followed her complaints of sexual harassment within a short period of time, thereby raising an

inference of retaliatory motivation.

321.     Jane Doe 3 was treated less favorably than other similarly situated employees who did

not engage in the statutorily protected activity of complaining about sexual harassment.

**VI.** **Retaliation for Reporting/Opposing Sexual Harassment in Violation of IHRA (775 ILCS 5/6 - 101(A))**

322. Jane Doe 3 re-alleges Paragraphs 1-11, 259-299, 316-321 and incorporates them as though fully set forth herein as Paragraph 322.

**VII.** **Gender Discrimination (Disparate Treatment) in Violation of Title VII (42 U.S.C. §§ 2000e-2)**

323. Jane Doe 3 re-alleges Paragraphs 1-11, 259-299 and incorporates them as though fully set forth herein as Paragraph 323.

324. CFD discriminated against Jane Doe 3 due to her gender by subjecting her, and other female employees, to disparate treatment and unequal terms and conditions of employment by:

   a. Subjecting her to a pattern or practice of hostile work environment due to sexual harassment;

   b. Retaliating against her for reporting acts of sexual harassment;

   c. Allowing male superiors to berate her while not subjecting male employees to similar treatment;

   d. Failing to adequately address her complaints;

   e. Subjecting her and other women, to Bedon's conduct when complaints had been made about him prior and CFD failed to act;

   f. By promoting Bedon, when there had been complaints against him, yet subjecting her along with other women to adverse employment actions when they complained;

   g. Having received complaints about Bedon prior to hers, yet had kept him employed;

   h. By having a zero-tolerance policy of violence, but not enforcing it when it came to female's complaints of sexual harassment and hostile work environment against males;

   i. Threatening that Jane Doe 3 was not cooperating with an "investigation" and could be disciplined.

325. CFD had no sexual harassment training in place at the time these events took place, nor did it implement prompt remedial measures when notified of the employment practices violating Title VII.

326. At all times, Jane Doe 3 performed her job according to CFD's legitimate expectations.

327.    CFD treated similarly situated male employees outside the protected class more favorably.

**VIII.    Gender Discrimination (Disparate Treatment) in Violation of IHRA (775  ILCS 5/2-102(A))**

328.    Jane Doe 3 re-alleges Paragraphs 1-11, 259-299, 323-327 and incorporates them as though fully set forth herein as Paragraph 328.

## JANE DOE 4

The following constitutes charges of discrimination against the City of Chicago. The causes of action included in this document:

- Sexual Harassment – Hostile Work Environment under Title VII
- Sexual Harassment – Hostile Work Environment under IHRA
- Sexual Harassment – Quid Pro Quo under Title VII
- Sexual Harassment – Quid Pro Quo under IHRA
- Retaliation for Reporting/Opposing Sexual Harassment under Title VII
- Retaliation for Reporting/Opposing Sexual Harassment under IHRA
- Gender Discrimination (Disparate Treatment) in Violation of Title VII
- Gender Discrimination (Disparate Treatment) in Violation of IHRA

## FACTUAL ALLEGATIONS

329.    Jane Doe 4 is a paramedic with the Chicago Fire Department. She has worked for the CFD since May 2015.

330.    Starting on or around August 2017, to present, Jane Doe 4 was subjected to sexual harassment by Ambulance Commander George Bedon, her superior.

331.    At all times relevant to the Complaint, Bedon has had authority to take tangible employment actions against Jane Doe 4, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

332.    From August to November 2017, George Bedon, made the following comments to Jane Doe 4:

    a.    "Mamacita" ("good looking" or "hot mama" in Spanish). Bedon said this repeatedly.

    b.    "Don't stop working out."

    c.    "Your butt looks great."

    d.    "Don't lose any more weight."

    e.    "What color are your nipples?"

    f.    "What kind of panties do you wear at work?"

    g.    "Do your panties get wet at work?"

333.    Jane Doe 4 rebuffed each of these comments.

334.    On November 6, 2017, around 2:00 p.m., at Norwegian Hospital, Jane Doe 4 entered the paramedic room in search of a backboard for her ambulance.

335.    George Bedon was sitting in the room by himself.

336.    Jane Doe 4 said, "Hello."

337.    He made a comment asking Jane Doe 4 to let him hug her.

338.    Jane Doe 4 did not consent.

339.    He got off his seat quickly and came towards her to give her a hug.

340.    He leaned in to give Jane Doe 4 what she thought was a hug, and then, simultaneously, he put his arms over hers (hers were at her sides) and kissed her on the mouth.

341.    He pressed his body against hers.

342.    Jane Doe 4 feared for her safety because he put his arms over hers so she could not defend herself.

343.    After he released her, he sat back down.

344.    Jane Doe 4 said, in shock, "I did not know you were going to kiss me on the mouth."

345.    George Bedon replied, "It's no big deal."

346.    Again in shock, Jane Doe 4 said, "I don't want you kissing me on the mouth."

347.    Later that night, around 10 p.m., Jane Doe 4 reported this incident to FC Timothy.

348.    During the conversation, Timothy noted that George Bedon, "was a close hugger" and that he "liked to rub his body against" her.

349.    Jane Doe 4 had to leave on a 911 call. Two days later, Timothy told her she reported the incident up the chain of command.

350.    The following day, around 10 a.m. on November 7, 2017, Jane Doe 4 attended a bowling outing organized by Timothy at Habetler Bowl.

351.    At the bowling party, George Bedon again tried to hug her.

352.    Jane Doe 4 pulled back and gave him an excuse for having to step away.

353.    Later during the party, George Bedon forced his way into a picture to stand next to her and used it as an opportunity to again try to hug her against her will.

354.    At the outing, Timothy told several people about Jane Doe 4's complaint against George Bedon.

355.    On December 4, 2017, Jane Doe 4 attended an EEO meeting with the City of Chicago Fire Department, Department of Human Resources.

356.    Jane Doe 4 recounted the incidents with George Bedon.

357.    Jane Doe 4 also told them during the EEO meeting that she recalled being called "Mamacita" by Bedon, a term he used with other female employees of the fire department and nurses employed by other hospitals.

358.    Jane Doe 4 also recounted that Timothy reported that people in the fire department call Bedon "Handsy Bedon," and he has a reputation for sexually aggressive behavior.

359.    Jane Doe 4 also reported during this meeting that another female paramedic reached out to her about another incident of sexual harassment with Bedon, that she, too, had reported prior to Jane Doe 4's complaint.

360.    CFD has failed to investigate Jane Doe 4's complaints of repeated sexual harassment.

361.    On December 24, 2017, Jane Doe 4 received two disciplinary notices, from Internal Affairs Division, IR # 17-0707 and IR #17-0754.

362.    IR #17-0707 was dated four days after her EEO interview, December 8, 2017. This IR was for an alleged incident on November 2, 2017. It alleged Jane Doe 4 was rude and discourteous when she made a patient walk to the ambulance and further failed to assist a patient into the ambulance, and that she was not empathetic or sympathetic to the stress the patient was experiencing.

363.    IR # 17-0754 was dated December 20, 2017. It alleged that on November 26, 2017, Jane Doe 4 was present when her partner called an African-American patient a "nigger" and failed to report it.

364.    Jane Doe 4 refuted these allegations.

365.    On December 24, 2017, Jane Doe 4 submitted two Form 2(A)'s refuting these allegations to District Chief Juan Hernandez.

366.    These two IR's constituted retaliation for reporting the sexual harassment Jane Doe 4 received at the hands of Bedon.

367.    On January 9, 2018, Jane Doe 4 received a third IR, IR #17-0820, dated January 8, 2017. It alleged that on December 20, 2017, Jane Doe 4 was rude and discourteous to a disabled

patient's mother, Jane Doe 4 told the mother to be quiet, accused her of being drunk, and questioned why the son was at the party. It further alleged that Jane Doe 4 disallowed the mother to ride in the ambulance and told her to go to the hospital in the manner she reached the party.

368.    Jane Doe 4 refuted this allegation.

369.    On January 20, 2018, Jane Doe 4 submitted a Form 2(A) refuting this allegation to District Chief Hernandez.

370.    Without any warning, on January 25, 2018, Jane Doe 4 was called down to IAD in regards to her IR's.

371.    Upon information and belief, it routinely takes months for IAD to investigate complaints from patients.

372.    Jane Doe 4 was not afforded the opportunity to bring counsel with her and the demand to come to IAD was so short-notice that she scrambled to have a union representative present.

373.    During the IAD meeting, the investigator asked Jane Doe 4, "Why do you look like you're having trouble answering these questions?" She told him she was not having trouble answering his questions.

374.    The investigator's question led Jane Doe 4 to believe that this interview was an act of retaliation and an attempt to discredit her credibility and complaints about Bedon.

375.    Based on information and belief, CFD had received prior complaints about Bedon's sexually harassing behavior, yet failed to protect its female employees from it.

376.    Based on information and belief, CFD promoted Bedon in spite of its knowledge of his sexually harassing behavior.

## CLAIMS FOR RELIEF

### I.    Sexual Harassment – Hostile Work Environment under Title VII (42 U.S.C. §§ 2000e-2)

377.    Jane Doe 4 re-alleges Paragraphs 1-11, 329-376 and incorporates them as though fully set forth herein as Paragraph 377.

378.    Jane Doe 4 found Bedon's advances offensive and rejected them.

379.    Bedon's conduct at issue was based on sex.

380.    This harassment unreasonably interfered with Jane Doe 4's work performance by creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being.

381.    This harassment was so severe or pervasive as to alter the conditions of Jane Doe 4's employment and create an abusive working environment.

382.    This harassment was both objectively and subjectively offensive.

383.    At all times relevant to the Complaint, Bedon has had authority to take tangible employment actions against Jane Doe 4, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

**II.    Sexual Harassment – Hostile Work Environment under the IHRA (775 ILCS 5/2 102(D))**

384.    Jane Doe 4 re-alleges Paragraphs 1-11, 329-383 and incorporates them as though fully set forth herein as Paragraph 384.

**III.    Sexual Harassment– Quid Pro Quo Under Title VII (42 U.S.C. §§ 2000e-2)**

385.    Jane Doe 4 re-alleges Paragraphs 1-11, 329-376 and incorporates them as though fully set forth herein as Paragraph 385.

386.    Jane Doe 4 is a member of a protected group.

387.    Jane Doe 4 found Bedon's sexual advances offensive and rejected them.

388.    Bedon's harassment of Jane Doe 4 was sexually motivated.

389.    Jane Doe 4 took Bedon's sexual advances and requests for sex, as well as the retaliation from her rejection of his advances, to mean that providing sex to Bedon was a term or condition of her employment.

390.    Jane Doe 4's reaction to Bedon's advances affected tangible aspects of her employment, including receiving IR # 17-0707, #17-0754, and #17-0820.

391.    At all times relevant to the Complaint, Bedon was acting on behalf of The City of Chicago.

**IV.    Sexual Harassment– Quid Pro Quo Under IHRA (775 ILCS 5/2 102(D))**

392.    Jane Doe 4 re-alleges Paragraphs 1-11, 329-376, 385-391 and incorporates them as though fully set forth herein as Paragraph 392.

**V.    Retaliation for Reporting/Opposing Sexual Harassment in Violation of Title VII (42 U.S.C. §§ 2000e-2)**

393.    Jane Doe 4 re-alleges Paragraphs 1-11, 329-376 and incorporates them as though fully set forth herein as Paragraph 393.

394.    Jane Doe 4 made her first report of Bedon's sexually harassing conduct on November 6, 2017, to FC Timothy.

395.    At all times, Jane Doe 4 met the legitimate expectations of her employer.

396.    These adverse employment actions including IR # 17-0707, #17-0754, and #17-0820 followed Jane Doe 4's complaints of sexual harassment within a short period of time, thereby raising an inference of retaliatory motivation. Further, the manner in which she was hauled in to IAD on January 25, 2018, was an act of retaliation and was intended to rattle and silence her.

397.    Jane Doe 4 was treated less favorably than other similarly situated employees who did not engage in the statutorily protected activity of complaining about sexual harassment.

**VI.**   **Retaliation for Reporting/Opposing Sexual Harassment in Violation of IHRA (775 ILCS 5/6 - 101(A))**

398.   Jane Doe 4 re-alleges Paragraphs 1-11, 329-376, 393-397 and incorporates them as though fully set forth herein as Paragraph 398.

**VII.**   **Gender Discrimination (Disparate Treatment) in Violation of Title VII (42 U.S.C. §§ 2000e-2)**

399.   Jane Doe 4 re-alleges Paragraphs 1-11, 329-376 and incorporates them as though fully set forth herein as Paragraph 399.

400.   Respondent discriminated against Jane Doe 4 due to her gender by subjecting her, and other female employees, to disparate treatment and unequal terms and conditions of employment by:

   a.   Subjecting her to a pattern or practice of hostile work environment due to sexual harassment;

   b.   Retaliating against her for reporting acts of sexual harassment;

   c.   Allowing male superiors to berate her while not subjecting male employees to similar treatment;

   d.   Failing to adequately address her complaints;

   e.   Subjecting her and other women, to Bedon's conduct when complaints had been made about him prior and CFD failed to act.

   f.   By promoting Bedon, when there had been complaints against him. Yet subjecting Jane Doe 4 along with other women to adverse employment actions when they complained.

   g.   Having received complaints about Bedon prior to Jane Doe 4's complaint, yet had kept him employed.

   h.   By having a zero-tolerance policy of violence, but not enforcing it when it came to females' complaints of sexual harassment and hostile work environment against males.

   i.   Issuing excessive IR's and hauling her into an IAD meeting meant to intimidate her and silence her complaints against Bedon.

401.    Respondent had no sexual harassment training in place at the time these events took place, nor did it implement prompt remedial measures when notified of the employment practices violating federal and state employment laws.

402.    At all times, Jane Doe 4 performed her job according to CFD's legitimate expectations.

403.    CFD treated similarly situated male employees outside Jane Doe 4's protected class more favorably.

## VIII.  **Gender Discrimination (Disparate Treatment) in Violation of IHRA (775 ILCS 5/2-102(A))**

404.    Jane Doe 4 re-alleges Paragraphs 1-11, 329-376, 399-403 and incorporates them as though fully set forth herein as Paragraph 404.

## JANE DOE 5

The following constitutes charges of discrimination against the City of Chicago. The causes of action included in this document:

- Sexual Harassment – Hostile Work Environment under Title VII
- Sexual Harassment – Hostile Work Environment under IHRA
- Gender Discrimination (Disparate Treatment) in Violation of Title VII
- Gender Discrimination (Disparate Treatment) in Violation of IHRA
- Gender Discrimination in Violation of Title VII (Pattern and Practice)

## FACTUAL ALLEGATIONS

405.    Jane Doe 5 is a paramedic with the Chicago Fire Department. She has worked for the CFD since December 2005. She is currently a FPM (Fire Paramedic).

406.    As a trainee, in 2005, she was partnered with George Bedon on Ambulance 44. He was her supervisor.

407.    While Jane Doe 5 was his trainee, Bedon had authority to take tangible employment actions against Jane Doe 5, *i.e.*, to effect a significant change in employment status, such as

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

408.    During her training time, he made comments to Jane Doe 5 that his wife had put on weight after she had a child. He told Jane Doe 5 that she "looked good," had a "good body," and at this time, she would simply tell him to stop.

409.    In spite of Jane Doe 5's repeated requests for him to stop talking to her like this, he put his hand on her breast as she was driving the ambulance.

410.    She told him to never do this again.

411.    The harassment continued. Daily, Bedon would say things like: "What color are your nipples?" "Do you wear a thong?" "What kind of underwear are you wearing?" and "I can tell what kind of underwear you are wearing."

412.    At this time, Jane Doe 5 was afraid to tell anyone because she was a probationary employee and Bedon was responsible for evaluating her. After Jane Doe 5 continued to rebuff Bedon's advances, he would single her out by being hyper-critical of her work.

413.    After enduring this for several years, Jane Doe 5 asked for a transfer to a much busier and presumably less desirable assignment because she couldn't endure Bedon's treatment any longer.

414.    On November 6, 2017, Jane Doe 5 was assigned to provide medical assistance to hurricane victims in Humboldt Park. George Bedon was assigned as her partner for the day.

415.    Jane Doe 5 asked for the keys to the ambulance to get some equipment and Bedon responded, "No, we will go in together."

416.    She told Bedon she could handle it and he insisted they would go in together, refusing to give Jane Doe 5 the keys.

417.    Because of her history with him, Jane Doe 5 was fearful that Bedon would either attempt to or actually sexually assault her, so she kept the door open to the ambulance when they entered. Jane Doe 5 assumed that Bedon would be less likely to do something if other people could see.

418.    As they entered the ambulance, Bedon said, "It's been a long time" and pulled Jane Doe 5 in, tightly squeezing her so her breasts were pressed against his body and her arms were down so she could not defend herself.

419.    Bedon then kissed Jane Doe 5 on the mouth.

420.    Finally, she was able to get her arms free to push his chest away. As soon as Jane Doe 5 was away from him, she immediately grabbed the equipment and hurried out of the ambulance.

421.    After this happened, she felt scared, intimidated, and violated.

422.    Later that day, both Bedon and Jane Doe 5 were waiting for patients. Bedon continued to watch a female worker walk back and forth. He made comments and leered at her.

423.    He said, "Look at that ass," "Oh my goodness, look at that," "What big knockers," and made deep grunting noises as the female worker passed by.

424.    Jane Doe 5 told him to stop. She told him he could get in trouble. He just laughed.

425.    On January 9, 2018, Jane Doe 5 called FC Timothy. She told Timothy what happened in November. Timothy told Jane Doe 5 to call Adrianne Bryant. She called Bryant that day.

426.    In her call with Bryant, Bryant stated that Bedon was out of hand and there were lots of other women complaining about him.

427.    On January 22, 2018, at 3:20 pm, without any notice, an investigator from City's EEO called Jane Doe 5 to take her entire statement over the phone.

428.    Later, the City's EEO afforded Jane Doe 5 an opportunity to give her statement with counsel present on February 26, 2018.

429.    Based on information and belief, CFD had received prior complaints about Bedon's sexually harassing behavior, yet failed to protect its female employees from it.

430.    Based on information and belief, CFD promoted Bedon in spite of its knowledge of his sexually harassing behavior.

## CLAIMS FOR RELIEF

### I.    Sexual Harassment – Hostile Work Environment under Title VII (42 U.S.C. §§ 2000e-2)

431.    Jane Doe 5 re-alleges Paragraphs 1-11, 405-430 and incorporates them as though fully set forth herein as Paragraph 431.

432.    Jane Doe 5 found Bedon's advances offensive and rejected them.

433.    Bedon's conduct at issue was based on sex.

434.    This harassment unreasonably interfered with Jane Doe 5's work performance by creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being.

435.    This harassment was so severe or pervasive as to alter the conditions of Jane Doe 5's employment and create an abusive working environment.

436.    This harassment was both objectively and subjectively offensive.

437.    The conduct Jane Doe 5 experienced at the hands of the CFD constitute a continuing violation of Title VII.

### II.    Sexual Harassment – Hostile Work Environment under the IHRA (775 ILCS 5/2 102(D))

438.    Jane Doe 5 re-alleges Paragraphs 1-11, 405-437 and incorporates them as though fully set forth herein as Paragraph 438.

### III.  Gender Discrimination (Disparate Treatment) in Violation of Title VII (42 U.S.C. §§ 2000e-2)

439.    Jane Doe 5 re-alleges Paragraphs 1-11, 405-430 and incorporates them as though fully set forth herein as Paragraph 439.

440.    Respondent discriminated against Jane Doe 5 due to her gender by subjecting her, and other female employees, to disparate treatment and unequal terms and conditions of employment by:

   a.  Subjecting her to a pattern or practice of hostile work environment due to sexual harassment;
   b.  Failing to adequately address her complaints;
   c.  Subjecting her and other women, to Bedon's conduct when complaints had been made about him prior and CFD failed to act;
   d.  By promoting Bedon, when there had been complaints against him;
   e.  Having received complaints about Bedon prior to hers, yet had kept him employed;
   f.  By having a zero-tolerance policy of violence, but not enforcing it when it came to females' complaints of sexual harassment and hostile work environment against males;

441.    Respondent had no sexual harassment training in place at the time these events took place, nor did it implement prompt remedial measures when notified of the employment practices violating Title VII.

442.    At all times, Jane Doe 5 performed her job according to CFD's legitimate expectations.

443.    CFD treated similarly situated male employees outside her protected class more favorably.

### IV.  Gender Discrimination (Disparate Treatment) in Violation of IHRA (775 ILCS 5/2 102(A))

444.    Jane Doe 5 re-alleges Paragraphs 1-11, 405-430, 439-443 and incorporates them as though fully set forth herein as Paragraph 444.

### CLAIMS COMMON TO ALL PLAINTIFFS

I.   **Gender Discrimination (Pattern or Practice) in Violation of Title VII (42 U.S.C. §§ 2000e-2)**

445.   Jane Does 1 – 5 re-allege Paragraphs 1-11, 12-80, 109-227, 259-299, 329-376,405-430

and incorporates them as though fully set forth herein as Paragraph 445.

446.   The City discriminated against Jane Does 1- 5 and fellow female employees due to their sex (female). As a part of that pattern and practice, the City:

a.   Fails to maintain adequate safety for female employees;

b.   Fails to maintain adequate separate bathrooms in all firehouses;

c.   Fails to maintain separate sleeping quarters in all firehouses;

d.   Fails to provide adequate training to employees regarding sexual harassment;

e.   Ignores claims of sexual harassment;

f.   Promotes individuals accused of sexual harassment;

g.   Fails to provide an environment free from discrimination;

h.   Fails to discipline (including terminate) males accused of sexual harassment;

i.   Fails to conduct a meaningful investigations of claims of sexual harassment;

j.   Fails to place males accused of sexual harassment on paid administrative leave pending the outcome of the investigation;

k.   Promotes that women who complain of sexual harassment be put on paid medical leave;

l.   Assigns women who complain of sexual harassment less favorable job assignments;

m.   Harasses, threatens, or intimidates women who complain of sexual harassment during interviews with the City's EEO Department;

n.   Accuses women who complain of sexual harassment of "conduct in violation of the Code of Professional Conduct; Disseminating false rumors, or information, regarding a member of the department to the detriment of such member; commission of any act prohibited by the Personnel Code Rule XVIII of the Code of the City of Chicago, or Department General and Special Orders or Directives or Bureau Orders; any conduct or action taken to use an official action for personal gain or influence; making a false official report;"

o.   Threatens females who report sexual harassment with discipline for not "cooperating" with a mock investigation;

p.   Subjects women who complain of sexual harassment to retaliatory discipline to discourage the reporting of sexual harassment claims.

447.     The policies described above are part of a pattern and practice of sex discrimination utilized by the Defendant, the City of Chicago, Chicago Fire Department, and constitute a violation of *42 U.S.C. § 2000e-2(a)*.

## II.     Title VII *Monell* Claim, 42 U.S.C. § 1983

448.     Jane Does 1 – 5 re-allege Paragraphs 1-11, 12-80, 109-227, 259-299, 329-376,405-430 and incorporates them as though fully set forth herein as Paragraph 448.

449.     Under 42 U.S.C. § 1983, Plaintiffs need to prove that (1) the City had an express policy that, when enforced, causes a constitutional deprivation; (2) the City had a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage within the force of law; or (3) plaintiff's constitutional injury was caused by a person with final policymaking authority.

450.     The City conducted its fire prevention and emergency medical assistance functions under color of state law, through its officers and employees.

451.     The City employed Richard Raney, George Olifer, and George Bedon to act in a supervisory capacity to employees of the CFD, including Plaintiffs, and at all times relevant to the Complaint, they acted under color of state law.

452.     The City is responsible for the acts of Raney, Olifer, and Bedon who acted within the scope of their employment and pursuant to a policy, custom and/or pattern of sex discrimination, retaliation and violation of individual rights of equal protection under the Fourteenth Amendment to the Constitution of the United States.

453.     At all times relevant to the Complaint, Plaintiffs have had the right to be free from sexual harassment, gender discrimination, and retaliation for reporting such conduct.

454. The City has a policy that is so permanent and well-settled as to constitute a custom or

usage within the force of law of discriminating against women based on their sex.

455. As a matter of both policy and practice, the City:

    a. Directly encourages, and fails to adequately discipline, supervise and control its officers, and its failure to do so manifests in deliberate indifference;

    b. Facilitates the very type of misconduct at issue here by failing to adequately punish and discipline prior instances of similar misconduct. This leads male CFD employees to believe their actions will never be scrutinized, and in that way, directly encourages future abuses such as those affecting Plaintiffs. Specifically, male CFD employees accused of misconduct can be confident that the Department will not investigate those accusations in earnest and will refuse to recommend discipline even where the offer has engaged in misconduct;

    c. Municipal policy-makers are aware of, and condone and facilitate by their inaction, a "code of silence" in the CFD, by which employees fail to report misconduct committed by other male officers, such as the misconduct at issue in this case;

    d. Fails to maintain adequate safety for female employees;

    e. Fails to maintain adequate separate bathrooms in all firehouses;

    f. Fails to maintain separate sleeping quarters in all firehouses;

    g. Fails to provide adequate training to employees regarding sexual harassment;

    h. Ignores claims of sexual harassment;

    i. Promotes individuals accused of sexual harassment;

    j. Fails to provide an environment free from discrimination;

    k. Fails to discipline (including terminate) males accused of sexual harassment;

    l. Fails to conduct a meaningful investigation of claims of sexual harassment;

    m. Fails to place males accused of sexual harassment on paid administrative leave pending the outcome of the investigation;

    n. Promotes that women who complain of sexual harassment be put on paid medical leave;

    o. Assigns women who complain of sexual harassment less favorable job assignments;

    p. Harasses, threatens, or intimidates women who complain of sexual harassment during interviews with the City's EEO Department;

    q. Accuses women who complain of sexual harassment of "conduct in violation of the Code of Professional Conduct; Disseminating false rumors, or information, regarding a member of the department to the detriment of such member; commission of any act prohibited by the Personnel Code Rule XVIII of the Code of the City of Chicago, or Department General and Special Orders or Directives or Bureau Orders; any conduct or

action taken to use an official action for personal gain or influence; making a false official report;"

r. Threatens females who report sexual harassment with discipline for not "cooperating" with a mock investigation;

s. Subjects women who complain of sexual harassment to retaliatory discipline to discourage the reporting of sexual harassment claims.

456. Because of this deprivation of rights to be free from sexual harassment, gender discrimination, and retaliation, Plaintiffs have suffered and continue to suffer ongoing damages.

## PRAYER FOR RELIEF FOR ALL CLAIMS

WHEREFORE, for the foregoing reasons, the Plaintiffs respectfully requests that this Court provide the following injunctive, equitable and monetary relief to the extent permissible under applicable law:

a. An order compelling the City to effectively and efficiently institute, carry-out, and enforce policies, practices and programs which eradicate City's past and present effects of unlawful employment practices.

b. A permanent injunction ordering and enjoining Defendant, City of Chicago, and its Fire Department, its commissioners, officers, managers, agents, employees, successors, assigns, and any and all persons in active concert and participation with it, from engaging in any and all employment practices which discriminate or appear to discriminate against Plaintiffs because of their sex, or appear to be retaliatory towards Plaintiffs because of their participation in legally protected activities.

c. A declaratory judgment that the practices complained of herein are unlawful and violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. 42 U.S.C. § 1983, and the Illinois Human Rights Act, 775 ILCS 5/2-102(D).

d. An order compelling the City to make Plaintiffs whole by providing them with compensation for any non-pecuniary losses, including damages for pain, humiliation, and suffering where appropriate.

e. An order awarding Plaintiffs economic, including compensatory, damages against the City where appropriate.

f. An order awarding Plaintiffs punitive damages where appropriate.

g. An order against the City awarding Plaintiffs for any and all litigation expenses and costs, including any and all reasonable attorney's fees, as provided for in 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 1988(b), and 775 ILCS 5/10-102(C).

h. An order awarding Plaintiffs pre-judgment and post-judgment interest.

i. Any and all other relief this Honorable Court deems just, equitable, and necessary to make Plaintiffs whole.

## **JURY DEMAND**

Plaintiffs demand trial by jury on all claims and issues that may be tried to a jury.

Dated: May 1, 2018                                 Respectfully submitted,

**Jane Doe 1**
**Jane Doe 2**
**Jane Doe 3**
**Jane Doe 4**
**Jane Doe 5**

By:_ /s/ Amy S. Cramer_
       /s/ Thomas M. Cramer
       Amy S. Cramer (ARDC No. 6308140)
       acramer@cramerlawchicago.com
       Thomas M. Cramer (ARDC No. 6322468)
       tcramer@cramerlawchicago.com
       Cramer Law Chicago, P.C.
       180 N. LaSalle Street
       Suite 3700
       Chicago, Illinois 60601
       312-924-0219


By:   /s/ Hannah Valdez Garst
       Hannah Valdez Garst (ARDC No. 6279954)
       hannahgarst@garstlaw.com
       Law Offices of Hannah Garst
       121 S. Wilke Rd., Suite 301
       Arlington Heights, IL 60005
       773-248-6504
       773-305-5183 (fax)


By:   /s/ Lynn T. Palac
       Lynn T. Palac, Attorney at Law
       (ARDC No. 6270395)
       lynn@ltplawfirm.com
       121 S. Wilke Rd., Suite 301
       Arlington Heights, IL 60005
       847-404-9311