**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JANE DOE 1, JANE DOE 2,   )
JANE DOE 3, JANE DOE 4, and  )
JANE DOE 5,        )
            )
   Plaintiffs,     )
            )   No. 18 C 3054
   v.         )
            )   Judge Ronald A. Guzmán
CITY OF CHICAGO,    )
            )
   Defendant.    )

## MEMORANDUM OPINION AND ORDER

For the reasons explained below, the City of Chicago's motion for partial summary judgment is granted in part and denied in part, and plaintiffs' motion for partial summary judgment is denied.

## BACKGROUND

The Court previously summarized the background of this case as follows:

> Five Jane Doe plaintiffs brought this action against their employer, the City of Chicago (the "City"). Plaintiffs work as paramedics for the Chicago Fire Department (the "CFD"). Four of them allege that they have been sexually harassed and intimidated by superiors, and one alleges that she received the same treatment from a colleague. According to plaintiffs, the CFD, as a pattern or practice, has allowed sexual harassment, sex discrimination, and retaliation "to be pervasive throughout its firehouses and facilities." (ECF No. 1, Compl. at 1.) Plaintiffs assert claims for hostile work environment, quid pro quo harassment, retaliation, and disparate treatment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq.* Plaintiffs also assert a sex-discrimination claim under 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

(ECF No. 29, Mem. Op. & Order of Sept. 27, 2018, at 1.)

The City moves for summary judgment on all of plaintiffs' claims, except the Title VII sexual-harassment claims of Jane Does 3, 4, and 5. Jane Does 1, 3, 4, and 5 move for summary judgment on their IHRA sexual-harassment claims.

## LEGAL STANDARDS

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Davis v. Kayira*, 938 F.3d 910, 914 (7th Cir. 2019). On cross-motions for summary judgment, the Court construes all inferences in favor of the party against whom the motion under consideration is made. *Westfield Ins. Co. v. Nat'l Decorating Serv., Inc.*, 863 F.3d 690, 695 (7th Cir. 2017).

## DISCUSSION

### *The City's Motion*

#### A. *Monell* Claims

To establish the City's liability under *Monell*, plaintiffs must show that they were deprived of a federal right, as a result of (1) an express municipal policy, (2) a widespread custom or practice of the City, or (3) the deliberate act of a City policymaker, which proximately caused them injury. *See Davis v. Carter*, 452 F.3d 686, 691 (7th Cir. 2006). The City contends that plaintiffs cannot satisfy any of these requirements. Plaintiffs argue that they have sufficient evidence to proceed under the second and third prongs. As to the third prong, the Court disagrees. Plaintiffs reason as follows: "[I]n October 2018, municipal policymaker, Commissioner Ford, made a policy decision

to mandate all EEO[1] sexual harassment complaints go through IAD[2] and appointed [Steven Malec, the head of IAD] as the EEO Sexual Harassment Liaison. Ford's centralization of power to Malec demonstrated a policy decision that served to rubber-stamp CFD's widespread practice and policy of discriminating against women." (ECF No. 325, Pls.' Resp. Def.'s Mot. Summ. J. at 18-19.) Plaintiffs take issue with Malec's previous handling of sexual-harassment complaints, so they argue that "[Ford's] act alone creates a question of fact as to . . . whether the alleged constitutional violations were so widespread . . . [as] to allow an inference of supervisory encouragement, condonation, or acquiescence." (*Id.* at 19.) Plaintiffs' argument lacks coherence; it conflates the second and third *Monell* prongs. Furthermore, plaintiffs filed the instant suit in May 2018, and they fail to explain how, or point to any evidence that, Ford's action in October 2018 caused them constitutional injury.[3]

Plaintiffs have, however, produced sufficient evidence to proceed to trial on the second *Monell* prong, pursuant to which they assert that a widespread practice of sex discrimination exists within the CFD. Plaintiffs contend that the CFD encourages and facilitates sex discrimination by ignoring sexual-harassment complaints and failing to conduct meaningful investigations of alleged sex discrimination; failing to adequately punish incidents of sex discrimination; failing to supervise and control its employees; failing to provide effective training on sexual-harassment policies; and failing to maintain equal access to CFD facilities. (Pls.' Resp. Def.'s Mot. Summ. J. at 3-16.)

---

[1]Plaintiffs are referring to the City's EEO Division (hereinafter "EEO" or "EEO Division"), which is contained within the City's Department of Human Resources.

[2]Plaintiffs are referring to the CFD's Internal Affairs Division (hereinafter "IAD").

[3]To the extent that plaintiffs suggest that Malec is a final policymaker, they fail to develop any argument in that regard.

Plaintiffs present evidence of the following: former CFD Ambulance Commander George Bedon's sexual touching and sexual harassment of Jane Does 3, 4, and 5, as well as other female paramedics, occurring over a period of several years; former CFD Field Chief Richard Raney's sexual harassment of Jane Doe 1 in late 2017; retaliation against Jane Doe 1 after her complaint about Raney; retaliation against Jane Doe 2 after her complaint of harassment by a coworker; multiple complaints of sexual harassment in the mid- to late 2010s that went unaddressed, including complaints in 2014 that Bedon had sexually harassed multiple female employees; a sexual-harassment complaint that had to be submitted three times over a period of months in 2013 to get attention, and which the City treated as "intimidation" rather than sexual harassment; a sexual harassment complaint received in 2014 that Malec immediately forwarded to the alleged harasser; the City's inconsistent treatment of sexual-harassment complaints in terms of whether they are handled by the EEO Division or IAD; the CFD's failure to completely separate complainants and their alleged harassers while investigations took place; and the fact that some sexual-harassment investigations took several months to complete.[4]  Plaintiffs also point to evidence of the CFD's cursory approach to providing its employees training on its sexual-harassment policies, as well as its failure to provide female employees equal access to adequate bathrooms, showers, locker rooms, and sleeping quarters, which plaintiffs say is also an issue of safety.  Plaintiffs have offered

---

[4]The City heavily emphasizes that Raney and Bedon were investigated and disciplined in 2017 and that Bedon ultimately was recommended for termination.  Plaintiffs, on the other hand, point out that the investigation of the complaints made in November 2017 about Bedon's conduct was not completed until October 2018; Bedon remained on the job during the entire investigation; and he resigned in November 2018 in lieu of being disciplined.  As for Raney, Jane Doe 1 complained about him in October 2017; the City's investigation was not completed until July 2018; Raney remained on the job during the entire investigation and for three months after its completion; and he resigned in October 2018 in lieu of discipline.

sufficient evidence to allow a reasonable factfinder to conclude that the City maintained an informal policy or custom of sex discrimination.

To demonstrate that the City is liable for this alleged harmful policy, plaintiffs must show that City policymakers were deliberately indifferent to its known or obvious consequences. *See Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). "[A] practice of unconstitutional conduct, although lacking formal approval, may provide a basis for municipal liability if the plaintiff can establish that the policymaking authority acquiesced in a pattern of unconstitutional conduct." *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 511 (7th Cir. 1993) (citation and internal quotation marks omitted); *see also Calhoun v. Ramsey,* 408 F.3d 375, 380 (7th Cir. 2005) ("If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work."). "The longstanding or widespread nature of a particular practice would support the inference that policymaking officials must have known about it but failed to stop it." *McNabola*, 10 F.3d at 511. In addition to the evidence discussed above, plaintiffs also present evidence of a longstanding workplace culture of sex discrimination at the CFD: the presence of pornography in firehouses, over a span of many years; the prevalence of employees' unchecked use of sexually explicit and sexist language;[5] a "code of

---

[5]The record contains many startling examples, about one of which even CFD's deputy chief of labor relations, Janice Hogan, testified. Hogan, who administers discipline, testified at her deposition in March 2019 that about two years prior, a deputy fire commissioner had told her that he "would like to bend [her] over the table." (ECF No. 328, Dep. of Janice Hogan at 166, 168-69.) She further testified that she did not report the comment to anyone because she "wanted to keep [her] job," and she believed that if she reported it, she might lose her job. (*Id.* at 168-69.)

silence" that perpetuates sex discrimination;[6] and instances of retaliation against and ridicule of individuals who have reported sex discrimination, which plaintiffs say in turn create a fear of reporting.

In its motion, the City selectively describes the evidence,[7] disputes the accuracy of plaintiffs' evidence, and fails to acknowledge that competing reasonable inferences can be drawn from the evidence.[8] On summary judgment, however, the Court does not weigh evidence or determine credibility. Taking all inferences in the light most favorable to plaintiffs, and considering the record as a whole, the Court finds that plaintiffs have established genuine issues of material fact as to whether their constitutional injuries were the "plainly obvious consequences" of the City's alleged policy.

---

[6]In addition to their own and other witnesses' testimony about such a culture, plaintiffs submit evidence of a sign hanging in a CFD firehouse common kitchen in April 2019—nearly a year after this suit was filed—that read, "WHAT YOU SEE HERE / WHAT YOU SAY HERE / WHAT YOU HEAR HERE / STAYS HERE / WHEN YOU LEAVE HERE!" (ECF No. 326-47.)

[7]One example of the City's failure to discuss the totality of the evidence pertains to the 2014 complaints that Bedon had sexually harassed multiple female employees. The City maintains that its failure to investigate the complaints was simply a "mistake," and states that in January 2014, "CFD EEO Liaison Adri[a]nne Bryant failed to forward a ["Form 2A"] complaint about Bedon to the EEO Division . . .[,] so an investigation was inadvertently not initiated at that time." (ECF No. 300, Def.'s Mem. Supp. Mot. Summ. J. at 12.) The City, however, does not address the evidence that Malec, the head of IAD, received an email with the subject line "Possible Sexual Harassment complaint" and attaching the Form 2A; acknowledged receiving the Form 2A; and forwarded it to IAD investigators. (ECF No. 327-25.)

[8]For instance, in light of the entire record, competing inferences can be drawn from the evidence that the CFD has approximately 4,775 employees, and that from 2014 to 2019, the EEO Division conducted 17 investigations of allegations of sexual harassment, gender discrimination, or gender-based hostile work environment (5 of which involved the Jane Doe plaintiffs). (ECF No. 297, Def.'s L.R. 56.1 Stmt. ¶ 186.)

## B.       Title VII Pattern or Practice

The City asserts that it is entitled to summary judgment on plaintiffs' Title VII "claims" of

a pattern or practice of sex discrimination, because such claims are not available to private plaintiffs

who are not proceeding as a class.  For the reasons expressed by the Second Circuit in *Chin v. Port*

*Authority*, 685 F.3d 135, 149 (2d Cir. 2012), the Court concludes that plaintiffs may not use the

"pattern or practice" method of proof as an independent method of establishing liability.

"Pattern or practice" allegations do not constitute a discrete claim;[9] rather, they amount to

a method of proving discrimination.  The framework, set forth in *International Brotherhood of*

*Teamsters v. United States*, 431 U.S. 324 (1977), originated in the class-action context.  *Chin*, 685

F.3d at 148 (citing *Franks v. Bowman Transp. Co.*, 424 U.S. 747 (1976)).  In private, non-class

litigation, the pattern-or-practice method of proof is at odds with a plaintiff's ultimate burden of

proving intentional discrimination, as discussed by the *Chin* court as follows:

> Permitting private plaintiffs to use the pattern-or-practice method of proof outside
> the class action context would require us to extend this method beyond its current
> application.  This we decline to do.  Such an extension would allow nonclass private
> plaintiffs who have shown a pattern or practice of discrimination (but have not made
> out a disparate impact claim) to shift the burden to employers to prove that they did
> not discriminate against a particular individual.  But this would conflict with the
> Supreme Court's oft-repeated holding in the context of disparate-treatment, private
> nonclass litigation that "[t]he ultimate burden of persuading the trier of fact that the
> defendant intentionally discriminated against the plaintiff remains at all times with
> the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct.
> 1089, 67 L.Ed.2d 207 (1981).  To be sure, proof that an employer engaged in a
> pattern or practice of discrimination may be of substantial help in demonstrating an
> employer's liability in the individual case.  But such proof cannot relieve the plaintiff
> of the need to establish each element of his or her claim.
>
> We note that the district court in this case did not instruct the jury that a
> finding of a pattern or practice of discrimination shifted the burden of persuasion.
> Rather, the verdict sheet instructed the jury that each individual plaintiff was

---

[9]It would therefore be incorrect to say that the City is entitled to "summary judgment" on the
pattern-or-practice "claims."

required to prove by a preponderance of the evidence that he was discriminated against as part of the pattern or practice. This instruction only underscores, however, why there was no need for the jury to make a specific finding regarding a pattern or practice of discrimination in this private, nonclass suit, as opposed to determining directly whether each individual plaintiff had been intentionally discriminated against. Where, as here, there are only individual, nonclass disparate-treatment claims, a district court need not and should not instruct the jury that a common pattern of discrimination is an element of liability.

*Id.* at 149; *see also Van v. Ford Motor Co.*, 332 F.R.D. 249, 274 (N.D. Ill. 2019) ("[T]he liability phase in a pattern-and-practice case does not require showing that each individual member of the class was a victim of the employer's discriminatory policy, since proof of the pattern or practice supports an inference that any particular employment decision during the period in which the discriminatory policy was in force was made pursuant to that policy."). In short, the pattern-or-practice method of proof is incompatible with the method plaintiffs must use on their individual claims. Indeed, the Seventh Circuit has held that "[a]s an individual rather than a class action, . . . evidence of a pattern or practice can only be collateral to evidence of specific discrimination against the plaintiff herself." *Matthews v. Waukesha Cty.*, 759 F.3d 821, 829 (7th Cir. 2014); *Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990) ("Gilty filed an individual claim; this is not a class action. Consequently, his evidence of a pattern and practice can only be collateral to evidence of specific discrimination against the actual plaintiff.") (internal quotation marks and citation omitted). Plaintiffs contend that the instant case "presents unique facts," (Pls.' Resp. Def.'s Mot. Summ. J. at 20), but they do not develop any substantive argument regarding the nature of the pattern-or-practice method of proof or why they should be permitted to use such an evidentiary framework given that they are not proceeding as a class. Accordingly, plaintiffs may not avail themselves of the *Teamsters* method of proof. (Nonetheless, as the court observed in *Chin*, evidence

of an employer's general practice of discrimination "may be highly relevant to an individual disparate treatment . . . claim," 685 F.3d at 150.)

C.     **IHRA Claims**

The City maintains that plaintiffs' IHRA claims fail because plaintiffs did not exhaust their administrative remedies by obtaining a right-to-sue notice from the Illinois Department of Human Rights ("IDHR"). The IHRA requires plaintiffs to exhaust their administrative remedies; a complainant may commence a civil IHRA action in court only after the IDHR issues a final order notice. *Nickerson v. US Airways, Inc.*, No. 15 C 2970, 2016 WL 3563807, at *5 (N.D. Ill. July 1, 2016). Plaintiffs do not dispute that they did not receive right-to-sue notices from the IDHR, but they argue that lack of exhaustion of administrative remedies is an affirmative defense that the City waived by failing to raise it in its answer or in a subsequent motion to dismiss. In reply, the City contends that the IHRA's exhaustion requirement is jurisdictional and thus not waivable.

The failure to exhaust administrative remedies is an affirmative defense. *Mosely v. Bd. of Educ.,* 434 F.3d 527, 533 (7th Cir. 2006). The City did not raise the defense in its answer or its motion to dismiss certain claims. It did not mention the defense until October 21, 2019, in a motion for leave to file a partial motion for summary judgment, and it did not seek to assert the defense until November 5, 2019, when it moved for judgment on the pleadings or in the alternative for leave to amend its affirmative defenses. The Court denied the motion, explaining that by waiting until several months after fact discovery had closed, the City had not acted in a timely fashion. Accordingly, the City forfeited the failure-to-exhaust defense. *See Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 478-83 (7th Cir. 2019) (holding that the district court erred in not treating as forfeited defendant's affirmative defense that was raised for the first time at summary judgment and after the close of discovery); *see also Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1846 (2019) (holding

that "Title VII's charge-filing instruction is not jurisdictional" and thus is "subject to forfeiture if tardily asserted").

The City asserts that it can raise the exhaustion requirement at any time, because the issue is viewed as "jurisdictional" under the IHRA, in contrast with Title VII. The Court is not persuaded. In support of its argument, the City cites *Robinson v. Human Rights Commission*, 559 N.E.2d 229, 232-34 (Ill. App. Ct. 1990), in which the state appellate court held that the IHRA's requirement that a charge be filed within 180 days after an alleged violation is jurisdictional and not subject to tolling. The *Robinson* court based its holding in part on the language of section 8-111(C) of the IHRA, now section 8-111(D), which states that "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8-111(D). But, as the Seventh Circuit has expressly pointed out, section 8-111(D) "governs the jurisdiction only of 'court[s] of this state'—not federal courts." *Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 967 (7th Cir. 2013). In *Fort Bend*, the Supreme Court clarified that when mandatory charge-filing requirements "do not speak to a court's authority" or "refer in any way to the jurisdiction of the district courts," they are not jurisdictional. 139 S. Ct. at 1850-51 (internal punctuation omitted). Like its counterpart in Title VII, the IHRA's charge-filing provision has no hallmarks of a "jurisdictional prescription delineating the adjudicatory authority" of federal courts. *See id.* at 1851. It is therefore a rule that is subject to forfeiture. *See id.* at 1849.

### D.    Jane Doe 1's Sexual-Harassment Claims

The City argues that Jane Doe 1's sexual-harassment claims fail for two reasons.[10]  The first is that the conduct on which it is based is not "severe or pervasive," as is required to show a hostile work environment, *see Passananti v. Cook Cty.*, 689 F.3d 655, 664 (7th Cir. 2012).  This element is viewed both objectively and subjectively; factors in the assessment include "the severity of the allegedly discriminatory conduct, its frequency, whether it was physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with the employee's work performance." *Id.* at 667-68.

According to the City, Richard Raney's conduct was neither severe or pervasive nor objectively offensive.  (Def.'s Mem. Supp. Mot. Summ. J. at 18-19.)  "Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury.  In order to remove such a question of fact from the jury on summary judgment, the court would have to determine that no reasonable jury could find the conduct at issue severe or pervasive." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018) (citations omitted).  The City discusses some of Raney's conduct, but it does not develop any argument as to why it cannot be considered severe or offensive.  The Court agrees with the City that one could not conclude from the record that Raney's conduct was "pervasive"; it took place over a period of no more than two or three weeks, and it does not appear to have been constant or to have occurred on every day during that period.

---

[10]Jane Doe 1, as well as Jane Does 2, 3, and 4, originally alleged two types of sexual-harassment claims: hostile work environment and quid pro quo.  The parties offer no separate analysis of the quid pro quo claims, which plaintiffs appear to have abandoned.  Indeed, in the parties' proposed final pretrial order, Jane Does 1, 2, 3, and 4 state that they "are waiving all claims related to 'Sexual Harassment—Quid Pro Quo' under Title VII and the IHRA."  (ECF No. 370 at 22.)

Nonetheless, a reasonable jury could conclude that Raney's conduct was severe and threatening enough to create a hostile work environment. "Harassment need not be severe *and* pervasive to impose liability; one or the other will do." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000). Harassment by a supervisor is treated as much more serious than a coworker's. *Gates v. Bd. of Educ.*, 916 F.3d 631, 638 (7th Cir. 2019). Jane Doe 1 submits evidence that Raney, who was her direct supervisor when she worked under his command, approached her and asked her repeatedly for a "no strings attached relationship," stating that his wife acted "like a grandmother" and that he had "not had a blow job in sixteen years"; Jane Doe 1 told a coworker that Raney had propositioned her; after Jane Doe 1's ambulance broke down, Raney arrived at the scene and asked her to ride with him while the ambulance was being towed (which she refused to do); and over a period of several days, Raney sent Jane Doe 1 text messages in which he used sexually explicit language and continued to pressure her for sex. There is also evidence that Raney created a situation in which Jane Doe 1 feared an imminent sexual assault. On October 24, 2017, Raney entered Jane Doe 1's sleeping quarters at the firehouse at night, without her permission and when the door was closed and the lights were out. According to Jane Doe 1, she was lying in bed, opened her eyes, and saw Raney standing right over her; he said, "I see you're sleeping." Jane Doe 1 told Raney to turn the lights on and open the door. When he did not comply and instead moved to block the door, she repeated herself and moved to turn on a small desk lamp. Jane Doe 1 panicked but managed to make small talk, and eventually told Raney to leave. After he left, she sat on the bed and cried. Jane Doe 1 further contends that Raney retaliated against her for not accepting his advances. On October 28, 2017, a mass-casualty incident drill took place. Jane Doe 1 says that when Raney called for her ambulance over the radio and she replied that her ambulance was "RIT" (Rapid Intervention Team, and according to Jane Doe 1 not part of the drill itself but available to

respond in the event of a real emergency during the drill), Raney harshly berated her over the radio that she should do what she was told and not question him. Raney's conduct cannot be deemed insufficiently severe or offensive as a matter of law.

The City also contends that Jane Doe 1 cannot establish a basis for employer liability. Under Title VII, "employers are strictly liable for the discriminatory acts perpetrated by supervisors and they are liable for the discriminatory acts of others—coworkers, independent contractors, customers, inmates[,] etc.—only if they are negligent either in discovering or remedying the harassment." *Johnson*, 892 F.3d at 904. "[A]n employee is considered the supervisor of the alleged victim of discrimination when 'the employer has empowered that employee to take tangible employment actions against the victim.'" *Id.* at 905 (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013)). "The ability to direct another employee's tasks is simply not sufficient." *Vance*, 570 U.S. at 439. Jane Doe 1 has submitted evidence that Raney had the authority to direct her daily tasks, but not that he was empowered to take any tangible employment actions that had direct economic consequences for her, such as firing, demoting, transferring, or disciplining her. She submits evidence that Raney had the ability to "report" her and thereby initiate a disciplinary investigation, but that is true of any CFD employee; it is an insufficient basis for according him "supervisor" status under Title VII.[11]

---

[11]The City does not offer a separate analysis of employer liability under the IHRA as to Jane Doe 1, nor does it respond to plaintiffs' argument that the analysis is different from that under Title VII. Therefore, the City waives the issue. It is true that courts evaluate Title VII and IHRA claims under largely the same standards, but the statutes differ with respect to employer liability. "The definition of a 'supervisor' under Title VII differs from the definition of this term under the IHRA. . . . [U]nder the IHRA, a person is a supervisor as long as he or she works for the employer in some general supervisory role." *Hilgers v. Rothschild Inv. Corp.*, No. 15 C 3572, 2017 WL 4164036, at *8 (N.D. Ill. Sept. 20, 2017); *see also Sangamon Cty. Sheriff's Dep't v. Ill. Human Rights Comm'n*, 908 N.E.2d 39, 46 (Ill. 2009). Plaintiffs' partial motion for summary judgment on the IHRA claims of Jane Does 1, 3, 4, and 5 is addressed below.

The next issue, then, is whether there is sufficient evidence from which a trier of fact could reasonably conclude that the City was negligent in remedying Raney's harassment. In this context, negligence is the failure to take "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Cole v. Bd. of Trs.*, 838 F.3d 888, 898 (7th Cir. 2016). "If an employer fails to take action to prevent further harassment or forces the victim to bear the costs of 'solving' a problem she has reported, the employer may be held liable." *Lapka v. Chertoff*, No. 05 C 668, 2006 WL 3095668, at *5 (N.D. Ill. Oct. 30, 2006) (citing *Shafer v. Kal-Kan Foods*, 417 F.3d 663, 665 (7th Cir. 2005)), *aff'd*, 517 F.3d 974 (7th Cir. 2008).

On October 29, 2017, Jane Doe 1 reported Raney's conduct to a CFD Field Chief, who escalated the complaint within the department. The City asserts that it undisputedly "took prompt action to ensure any potential for harassment ended" while the City investigated Jane Doe 1's complaint, and it points out that Jane Doe 1 was promptly reassigned to an ambulance under a different Field Chief and to a geographic area far away from the area for which Raney was responsible. (Def.'s Mem. Supp. Mot. Summ. J. at 21.) Raney was then reassigned to a different area and different shift than Jane Doe 1, says the City, and Raney and Jane Doe 1 never had further contact.

There is evidence from which a jury could reasonably conclude, however, that the City's response was not prompt or appropriate. "A prompt investigation is the first step toward a reasonable corrective action." *Cole*, 838 F.3d at 898. According to the City's own report, Raney was not interviewed about Jane Doe 1's complaint until April 30, 2018, one day prior to the filing of this suit, and witnesses were not interviewed until February 2018 at the earliest. The EEO's investigation report, which recommended that Raney be suspended, was not issued until July 2018. No discipline was actually imposed at that point. On October 15, 2018, after there was a report that

Raney had asked a different female paramedic if she thought he was a "rapist," Raney was informed that he was being placed on paid administrative leave and was to be suspended for thirty days, with the suspension to begin on October 27. Raney never served the suspension; instead, he resigned his employment on October 16, 2018. Jane Doe 1 also presents evidence that in November 2017, she requested that Raney, or in the alternative she, be placed on administrative leave; neither was placed on leave; and their post-complaint assignments did not entirely ensure that she would not have to work with him. For instance, in January 2018, they were assigned to different shifts at the same firehouse; Jane Doe 1 was moved to the second shift, and Raney remained on the third shift. This situation, according to Jane Doe 1, created stress for her due to the possibility of contact around shift changes, so when she worked, she had to check the CFD's scheduling system to ascertain where Raney would be working to make sure she would not encounter him. This is evidence from which a jury could conclude that Jane Doe 1 was made to bear the costs of a possible resolution of the problem she reported, especially considering that the resolution did not occur until nearly a year after her complaint.

### E. Jane Doe 2's Sexual-Harassment Claims

The City contends that it is entitled to summary judgment on Jane Doe 2's sexual-harassment claims, for several reasons. Jane Doe 2's claims are based on the conduct of firefighter George Olifer, a coworker with whom she had a dating relationship that ended in February 2014.

As discussed in the Court's memorandum opinion and order on the City's motion to dismiss certain claims, Jane Doe 2's claims involve three periods of conduct. The first period was from February to March 2014, when Jane Doe 2 ended her relationship with Olifer and alleges that he then posted on Facebook a photo of her in a bra and underwear along with a sexual comment; sent her an email that she found degrading; repeatedly drove by her house; and sent her numerous text

messages seeking to reconcile. Jane Doe 2 complained to the CFD that Olifer was harassing her after their breakup by calling and sending text messages. On March 19, 2014, Jane Doe 2 made a report to police about Olifer's conduct, and she shared that report with the CFD.[12] She also applied for an Order of Protection, but ultimately decided not to pursue it or to attend a continued court date. The IAD opened an investigation. On May 13, 2014, the IAD interviewed Jane Doe 2 about her complaint against Olifer. During the interview, Jane Doe 2 reported that Olifer had stopped harassing her and that they had had no contact, she no longer had the text messages from him, and she did not want to further pursue the investigation. On September 24, 2014, the IAD issued a report finding the complaint "Not Sustained" because Jane Doe 2 had informed the IAD that she did not wish to pursue the investigation and Olifer had denied the allegations. From October 2014 to October 2016, Jane Doe 2 had minimal to no contact with Olifer, and she does not allege that he harassed her during this period of time.

The second period of alleged sexual harassment occurred in October and November 2016. Jane Doe 2 requested and was granted a transfer to the Ambulance 39 district in Norwood Park. On

_____

[12]The City submits the IAD's Case Report on its 2014 investigation of Jane Doe 2's complaint about Olifer through the declaration of Sanjeev Mikha'il, Supervising Investigator of the IAD. (ECF No. 299 at 125-29, Decl. of Sanjeev Mikha'il.) Plaintiffs move to strike the City's fact statements to the extent they rely on evidence the City attempts to introduce through Mikha'il, and they request that the Court "disregard" the declaration and supporting exhibits, on the basis that the City failed to disclose Mikha'il as a witness. The City does not dispute that it failed to disclose Mikha'il but asserts that there is no basis to strike anything because he "is not a fact witness [and] is merely serving as a business records custodian." (ECF No. 342, Def.'s Reply Supp. Mot. Summ. J. at 2.) That statement is not entirely correct, given that Mikha'il attempts to summarize the contents of various documents and that his declaration includes such factual statements as "[o]n March 20, 2014, IAD opened an investigation related to allegations that [Olifer] harassed [Jane Doe 2] with calls and text messages." (Mikha'il Decl. ¶ 5.) To the extent the City offers Mikha'il's testimony as a foundational witness, strictly for the purpose of introducing documents, plaintiffs' request to strike and disregard is denied. Otherwise, the Court has disregarded Mikha'il's declaration as to any substantive matters.

October 3, 2016, Jane Doe 2 arrived at her new firehouse and encountered Olifer, who was finishing a shift. He told her that he was frequently assigned to that firehouse, and asked her (in a "threatening tone," says Jane Doe 2) how her "little ladies" (her daughters) were doing. Jane Doe 2 then told her husband, who is also a CFD paramedic, about the encounter. On November 10, 2016, Jane Doe 2 saw Olifer at the firehouse again and told her husband, who contacted First Deputy Commissioner Richard Ford to express the concern that Olifer was working at the same firehouse as Jane Doe 2. Shortly thereafter, Olifer was instructed by a Battalion Chief to leave the firehouse and report to a different firehouse for the remainder of the day. Jane Doe 2 then overheard Olifer yelling, "This is bullshit! This is racism! That fucking bitch did this!" as he walked to the parking lot. In response to text messages about the situation from Jane Doe 2's spouse, Ford suggested to Jane Doe 2's spouse that she complete a "Form 2" complaint regarding her concerns about working with Olifer. Ford also suggested that she reference an "unharmonious work environment," a phrase used in one of the CFD's general orders. On November 10, 2016, Ford sent an email to various CFD supervisors stating that Olifer was not to be assigned to "Engine 119 or [Truck]-55" (which, evidently, was Jane Doe 2's assignment). That day, Jane Doe 2 submitted a Form 2 complaint in which she stated that she did not feel safe working in the same firehouse as Olifer due to "previous incidents" in 2014; that she was now assigned to a firehouse in the same district as Olifer; she had been informed by others that Olifer told them that he was requesting assignments to her firehouse to "fuck with her"; and she believed his requests and comments were "aggressive actions towards [her] in order to create an uncomfortable and unharmoni[o]us work environment." (ECF No. 299 at 5-6, Dep. of Jane Doe 2, Ex. 18.) In her complaint, Jane Doe 2 did not mention the comments she allegedly overheard on the day Olifer was reassigned. Jane Doe does not recall having spoken with or worked at the same firehouse as Olifer from November 10, 2016, to December 21, 2017.

The IAD opened an investigation into Jane Doe 2's 2016 complaint. Jane Doe 2, Olifer, and several witnesses were interviewed. IAD Investigator Nadine Skelly issued a report on May 31, 2017, describing her findings, among them that witnesses did not corroborate that Olifer had made statements about "fucking with" Jane Doe 2 or that he had yelled after being reassigned. Skelly concluded that, "[a]ccording to witness interviews, the only thing Olifer did [on November 10, 2016] was report for duty and he did not violate any Department or City rules, regulations, or orders." (ECF No. 299 at 143-49, Mikha'il Decl., Ex. 5.) As a result, the investigation was closed with no further action taken.[13] On May 31, 2017, Hogan, CFD's deputy chief of labor relations, sent an email to several City employees stating that "the current IAD matter regarding [Olifer] is unfounded" and that she had authorized Olifer to take assignments to Engine 119.

The third instance of conduct on which Jane Doe 2 bases her claims occurred on December 21, 2017. On her way to work that day, Jane Doe 2 learned from a colleague that Olifer was assigned to the same firehouse. When Jane Doe 2 arrived at work, she went to the battalion chief's office, where she was informed that Olifer would be reassigned to another firehouse. When Jane Doe 2 was in the office with another coworker, Olifer "burst into" the room, pointed at Jane Doe 2, who was sitting in a chair and crying, and said, "Oh, excuse me! Excuse me!" while looking at Jane Doe 2 and her coworker. Then he left the room. That day, Jane Doe 2 submitted a Form 2 in which she stated that this contact made her "uncomfortable and intimidated." (ECF No. 299 at 8-9, Jane Doe 2 Dep., Ex. 32.) It is unclear what became of this complaint.

---

[13]On May 21, 2017, Olifer submitted a complaint that Jane Doe 2 had falsely accused him of harassment. Those proceedings are discussed below with respect to Jane Doe 2's retaliation claims.

The City asserts that Jane Doe 2 cannot recover under Title VII or the IHRA for Olifer's alleged conduct in 2014 and 2016 because it occurred outside the relevant limitations periods.[14] The City presented the same argument in its motion to dismiss certain claims, and Jane Doe 2 invoked the continuing-violation doctrine, maintaining that the entire course of Olifer's conduct could be considered part of a single unlawful employment practice. "The continuing violation theory allows a plaintiff to reach back to get relief for an act of discrimination that occurred outside the statute of limitations by linking it as one continuous act with a discriminatory act that took place within the limitations period." *Place v. Abbott Labs.*, 215 F.3d 803, 807 (7th Cir. 2000). This Court found that Jane Doe 2's allegations about Olifer's conduct in December 2017, which occurred within the limitations period, were sufficient to plausibly suggest a continuing violation at the dismissal stage. (Mem. Op. & Order of Sept. 27, 2018, at 6.) Jane Doe 2 now contends that the Court "has already determined" that her sexual-harassment claim "is not time barred." (Pls.' Resp. Def.'s Mot. Summ. J. at 28.) Not so. Plausibly suggesting a continuing violation is different from proving one, and on summary judgment, Jane Doe 2 must demonstrate a question of fact on this issue.

Based on the principles discussed by the Seventh Circuit in *Ford v. Marion County Sheriff's Office*, 942 F.3d 839, 851-54 (7th Cir. 2019) (citing *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)), the Court concludes that the record does not support the conclusion that Olifer's actions in 2014 were part of a single unlawful employment practice. Various factors, including time and an employer's intervening action, guide the inquiry as to whether alleged incidents of discriminatory harassment are related for purposes of constituting a continuing

_____

[14]Jane Doe 2's administrative charge was filed on January 29, 2018. The limitations period under Title VII is 300 days, 42 U.S.C. § 2000e-5(e)(1), and the IHRA limitations period at the relevant time was 180 days, 775 ILCS 5/7A-102(A)(1), (A-1)(1).

violation. *Id.* at 852-53. Jane Doe 2's complaint in 2014 about Olifer did not languish; she was interviewed within two months of filing the complaint. She reported that Olifer had stopped harassing her and that she no longer had copies of his text messages. According to the report, Jane Doe 2 also stated that did not want Olifer to get in trouble, nor did she want to further pursue the complaint; while she disputes using these exact words,[15] she does not dispute that she communicated as much to the IAD. Subsequently, nearly two years passed without contact between Jane Doe 2 and Olifer; Jane Doe 2 testified that she did not recall seeing Olifer on any "runs" from October 2014 to October 2016. The two-year gap between the 2014 events and the incidents in 2016 and 2017, combined with the intervening actions of the CFD's prompt investigation and Jane Doe 2's choice not to pursue the complaint, render the 2014 events a separate employment practice, which is not actionable because it is time barred. *See id.* at 853 (affirming district court's severance of hostile-work-environment claim into two employment practices where there was an eighteen-month gap between events along with a change in the employee's supervisors and an intervening remedial action); *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 712 (7th Cir. 2017) (large gaps between incidents can prevent allegations from forming a single employment practice). Jane Doe 2 relates the underlying facts in great detail, but does not develop any legal argument as to why, given the time gap and intervening events, the 2014 incident can reasonably be viewed as being part of a continuous employment practice.

---

[15] Jane Doe 2 also submits that the "harassment from Olifer" in fact did not stop, and points to her deposition testimony that Olifer had sent her text messages in July, August, and October 2014. (ECF No. 326, Pls.' L.R. 56.1 Stmt. Add'l Facts ¶ 90.) But Jane Doe 2 does not assert, and there is no evidence, that she complained to the CFD about these text messages.

As for the remaining conduct, which occurred in 2016 and 2017,[16] the Court agrees with the City that there is insufficient evidence of severe or pervasive harassment so as to create a hostile work environment. Whether a work environment is hostile is determined by looking at all the circumstances, including the frequency and severity of the discriminatory conduct; whether it was physically threatening or humiliating, or merely offensive; and whether it unreasonably interfered with the employee's work performance. *Gates*, 916 F.3d at 636. Jane Doe 2's evidence is that in 2016, Olifer, an occasional coworker and not her supervisor, asked her how her "little ladies" (her daughters) were doing; she overheard Olifer yell about "bullshit," "racism," and "that fucking bitch" after he was reassigned to another firehouse, ostensibly due to her spouse's complaint to Ford; Jane Doe 2 was told by others that Olifer said that he would request assignments to her firehouse to "fuck with her;" and, more than a year later, Olifer "burst into" a supervisor's office in which she was meeting with coworkers regarding Olifer's presence, pointed at her, and said, "Oh, excuse me! Excuse me!" before leaving the room. Olifer's direct contact with Jane Doe 2 is limited to his question about her daughters and his having entered an office, interrupted her meeting, and exclaimed, "Excuse me." Jane Doe 2 focuses almost exclusively on her fear of Olifer and the distress the events caused her (primarily discussing the events of 2014, which the Court has held are time barred), but she does not attempt to explain why Olifer's infrequent contacts with her in 2016 and 2017, even in the context of their prior history, created a workplace that was "permeated with discriminatory intent," *Watkins v. Riverside Medical Center*, 758 F. App'x 547, 551 (7th Cir. 2019). As for Olifer's less-innocuous comments, they are alleged to have been indirect. Jane Doe 2 overheard the "fucking bitch" comment; it was not directly addressed to her, and she says that others

---

[16]For purposes of summary judgment, the Court will assume, without deciding, that the events of 2016 and 2017 are part of a single employment practice.

informed her about Olifer's comment or comments about his motive for requesting assignments. "The more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that the worker's working environment was actually made unbearable, as the worker claims." *Yuknis v. First Student, Inc.*, 481 F.3d 552, 555 (7th Cir. 2007). No reasonable jury could find Olifer's conduct in 2016 and 2017 to be severe or pervasive; it does not come close to the level required to support a hostile-work-environment claim. Jane Doe 2's failure to present sufficient evidence of severe or pervasive conduct obviates the need to discuss the other issues the City raises in regard to her sexual-harassment claims.

The Court grants the City's motion for summary judgment on Jane Doe 2's sexual-harassment claims under Title VII and the IHRA.

F.     **Retaliation Claims**

The City also seeks summary judgment on the retaliation claims of Jane Does 1, 2, 3, and 4 (Jane Doe 5 does not assert such a claim). To succeed on a Title VII or IHRA retaliation claim, a plaintiff must present enough evidence for a reasonable jury to conclude that (1) she engaged in statutorily-protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two. *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). "In the retaliation context, the challenged adverse action need not be one that affects the terms and conditions of employment, but it must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Id.* at 856 (internal quotation marks omitted) (citing, *inter alia*, *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)).

### 1. Jane Doe 1

The City contends that Jane Doe 1 did not suffer an adverse employment action. Jane Doe 1 identifies the following as adverse employment actions resulting from the City's alleged discrimination: (1) her superiors' disclosure of information about her complaint against Raney, including Jane Doe 1's identity, to a subordinate, who Jane Doe 1 says then engaged with others in a campaign of retaliatory harassment that forced her to change shifts; and (2) her transfer to a less-favorable ambulance assignment.[17] The City does not address the disclosure aspect of the first action[18] and offers only a perfunctory argument in reply that these actions cannot not be considered sufficiently adverse, so it has waived these arguments. *See McCottrell v. White*, 933 F.3d 651, 670 n.12 (7th Cir. 2019) ("Perfunctory and undeveloped arguments are waived . . . .").

---

[17]Jane Doe 1 also suggests that Raney's alleged act of berating her over the radio during the mass-casualty incident drill constituted an adverse employment action. The City points out that this incident occurred prior to Jane Doe 1's formal complaint. In response, Jane Doe 1 contends that Raney used the radio incident to retaliate against her for having rebuffed his advances. But she fails to develop an argument that her rejection of Raney's advances qualifies as protected activity under the statute, so the argument is waived. *See United States v. Alden*, 527 F.3d 653, 664 (7th Cir. 2008) ("Because it is not the obligation of this Court to research and construct the legal arguments available to parties, these arguments are waived and warrant no discussion.") (citation omitted).

[18] The City characterizes this allegedly adverse action as merely the assignment to work with the subordinate. (Def.'s Reply Supp. Mot. Summ. J. at 24.)

## 2.     Jane Doe 2

Jane Doe 2's retaliation claim is based on the CFD's sustaining Olifer's May 2017 complaint that she had falsely accused him of harassment.[19]  The City first argues that Jane Doe 2 cannot show that she engaged in statutorily-protected activity because there is insufficient evidence of protected speech and because she was complaining about a "personal conflict," not gender-based conduct. (Def.'s Mem. Supp. Mot. Summ. J. at 30.)  The Court is unpersuaded.  Jane Doe 2 claims that she was retaliated against by being wrongfully disciplined after bringing her November 2016 complaint against Olifer.  She did not need to use the magic words "sexual harassment" in her complaint to CFD to bring her speech within the protection of the relevant statutes.  *See Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000).  Providing facts sufficient to create an inference of opposition to sexual harassment can be sufficient.  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).  In Jane Doe 2's 2016 complaint, she referred to her 2014 application for an Order of Protection against Olifer and stated that she did not feel safe working at the same firehouse with him; that she had been informed by others that Olifer was requesting assignments to the same firehouse for the purpose of "fucking with her"; and that she felt that his conduct was "aggressive" and designed to create an "unharmoni[o]us [sic] work environment."  (Jane Doe 2 Dep., Ex. 18.)  There is also evidence that after being informed of Jane Doe 2's complaint, CFD

---

[19]The City contends that "Jane Doe 2 alleged she engaged in protected activity in 2014 when she complained to IAD about Olifer," and it argues that "the Court should hold Jane Doe 2 to what she alleged in the complaint" because she is attempting to "re-write these allegations and side-step the over two-year gap in time by arguing that later complaints about Olifer's presence at her firehouse constituted the protected activity."  (Def.'s Reply Supp. Mot. Summ. J. at 23.)  The City reads the complaint too narrowly.  The City cites paragraph 246, which actually states that Jane Doe 2 "made her first report" about Olifer in 2014.  (ECF No. 1, Compl. ¶ 246.)  Jane Doe 2 did not indicate that the retaliation claim was based solely on the 2014 complaint.  She referred to "her complaint*s*," plural, *id.* ¶ 250, and included specific allegations about the 2016 complaint, *e.g.*, *id.* ¶¶ 162-64.

Commissioner Mary Sheridan sent Jane Doe 2 and Jane Doe 2's spouse an email attaching a copy of the CFD's written sexual-harassment policy. Thus, a jury could reasonably infer that the City more likely than not knew that Jane Doe 2's complaint was about sexual harassment. The City's assertion that Jane Doe 2's complaint was not about sexual harassment because it concerned a "personal conflict" misses the mark because the two are not mutually exclusive.

Next, the City contends that because the investigation of Jane Doe 2 on Olifer's complaint was "ultimately closed, with no discipline issued," (Def.'s Mem. Supp. Mot. Summ. J. at 34), it cannot be considered an adverse action. The Court disagrees. The relevant facts are as follows. After Olifer complained in May 2017 that Jane Doe 2 had falsely accused him of harassment, the IAD charged Jane Doe 2 in June 2017 with having made "fra[u]dulent allegations of harassment against her ex-boyfriend and CFD member, [] Olifer" in November 2016. (Mikha'il Decl., Ex. 11.) The IAD interviewed Jane Doe 2 in July 2017. The IAD also interviewed Olifer and other witnesses. In October 2017, the IAD issued a report sustaining the charge against Jane Doe 2 for a "false official report" and stating that "[n]o one interviewed, either for this case or [Jane Doe 2's November 2016 complaint] has collaborated with [sic] [Jane Doe 2's] accusations of Olifer harassing her, saying he was putting in for a transfer to fuck with her or calling her a bitch for having to be put on a different detail." (Mikha'il Decl., Ex. 14, Case Report, at 4.)[20] On November 10, 2017, counsel for Jane Doe 2 sent the City a demand letter related to the disciplinary charges. Two weeks later, the City "administratively closed" the disciplinary case by issuing a "906," a disposition that the City fails to fully explain. (ECF No. 341, Def.'s Resp. Pls.' L.R. 56.1 Stmt. ¶

---

[20]Furthermore, Skelly's report regarding Jane Doe 2's November complaint contains the following statement: "It appears that [Jane Doe 2] totally made up the recent allegations when she saw Olifer reporting for duty that morning at the firehouse." (Mikha'il Decl., Ex. 5.)

99.)  The City admits that the documents relating to the charges against Jane Doe 2 remain in her disciplinary file, and it does not address the effect of that fact on Jane Doe 2's career prospects. Given that the nature of a "906" disposition is unclear and that the relevant disciplinary documents will remain in Jane Doe 2's personnel file (including, possibly, the IAD's determination that Jane Doe 2 fabricated the incident in November 2016), the Court is unable to conclude that no jury could find that a reasonable employee would be dissuaded by the once-sustained charges from complaining about discrimination.  *See, e.g., Alamo v. Bliss*, 864 F.3d 541, 553 (7th Cir. 2017) (an employer's action can be sufficiently adverse for purposes of Title VII when, viewed in context, it "can be construed as a tool to marginalize or stigmatize" the plaintiff in the workplace).

### 3.      Jane Doe 3

Jane Doe 3's retaliation claim is based on the assertion that after she complained about George Bedon's conduct and filed this lawsuit, CFD's infection-control officer, Angelo Cordoba, gave her false information about the proper window of time in which to seek prophylactic treatment after she experienced HIV exposure.  The City maintains that no rational jury could find for Jane Doe 3 on her retaliation claim because there is no evidence that Cordoba knew that Jane Doe 3 had filed a sexual-harassment complaint against Bedon, and if Cordoba did not know about it, his actions could not constitute retaliation for it.  In response, Jane Doe 3 points to the timing of Cordoba's alleged advice as coming two months after her complaint.  But the timing is only suspicious if Cordoba knew that Jane Doe 3 had made her complaint about Bedon.  *See Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 925 (7th Cir. 2007) (citing *Tomanovich*, 457 F.3d at 668).  The City submits evidence that Cordoba does not know Jane Doe 3 and does not know about her complaint.  Jane Doe 3 speculates that Cordoba knew about her complaint because it's "not hard to figure out" her identity by examining publicly-available information together with the CFD's scheduling system.  (Pls.'

26

Resp. Def.'s Mot. at 36.)  Plaintiff's speculation is insufficient to raise a genuine issue regarding Cordoba's knowledge of her complaint.  Accordingly, the Court will enter summary judgment in favor of the City on Jane Doe 3's retaliation claim.

### 4. Jane Doe 4

Jane Doe 4's retaliation claim is premised on the following alleged adverse employment actions: (1) being disciplined after having complained about Bedon; (2) the refusal (by the head of the CFD's commissary) to give her smaller work-issued pants after she lost significant weight; and (3) being harassed by a firefighter, John Cullina.  The Court will enter summary judgment for the City because none of these incidents amount to materially adverse actions that can support a retaliation claim.  The only evidence of discipline issued to Jane Doe 4 is an oral reprimand for a patient's complaint that Jane Doe 4 was discourteous when she made the patient walk to an ambulance.[21]  Jane Doe 4 fails to develop an argument as to why the oral reprimand is an action that would dissuade a reasonable person from complaining.  The temporary[22] denial of better-fitting work pants is the kind of "petty slight" against which Title VII's anti-retaliation provision does not

---

[21]Jane Doe 4 says that she received several retaliatory disciplinary charges, "each resulting in discipline," but she fails to provide a citation to the record that supports this assertion.  Likewise, she fails to discuss the charges in any detail and simply concludes that "the number of disciplinary actions post-complaint raises a genuine issue of material fact." (Pls.' Resp. Def.'s Mem. Supp. Mot. Summ. J. at 37.)  The argument is wholly undeveloped and thus waived.

[22]Jane Doe 4 testified at her deposition that after she called her chief and complained about the situation, she received new pants five to ten minutes later.  (ECF No. 326-38, Dep. of Jane Doe 4 at 198.)

protect. *See Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016). Cullina's alleged conduct[23] consists of similarly petty slights. Moreover, as discussed above, the City can be liable for harassment by a coworker of Jane Doe 4 only if it negligently fails to discover or remedy the harassment. *See Johnson*, 892 F.3d at 904. Jane Doe 4 does not argue, even in a conclusory fashion, that the City acted negligently with regard to Cullina, and there is no evidence of any such negligence.

## G. Disparate-Treatment Claims

At the end of its opening brief, the City tacks on an argument that plaintiffs' disparate-treatment claims cannot withstand summary judgment because they are repetitive of plaintiffs' other claims. But the City's presentation is perfunctory, so the argument is waived.

### Motion of Jane Does 1, 3, 4, and 5

Jane Does 1, 3, 4, and 5 contend that they are entitled to summary judgment on their sexual-harassment claims under the IHRA. Their argument is as follows. A person is a supervisor for purposes of the IHRA as long as he works for the employer in a general supervisory role. *Hilgers,* 2017 WL 4164036, at *8; *Sangamon Cty. Sheriff's Dep't*, 908 N.E.2d at 46. There is no dispute that Raney and Bedon had supervisory roles within the CFD. The City, in its EEO Division's internal investigation, determined that there was "sufficient evidence to show that Raney engaged in sexual harassment when he sent multiple text messages of a sexual nature to" Jane Doe 1, and that there was sufficient evidence that Raney had violated the City's EEO Policy "by subjecting [Jane Doe 1] to sexual harassment" in October 2017. (ECF No. 326-50, City Mem. of July 24, 2018, at 15.) The

---

[23]Jane Doe 4 says that Cullina learned that she was lactose-intolerant and then said that the firehouse would make only meals that contained cheese; repeatedly asked her if she wanted cheesecake; told her that her hair needed a dye job; made fun of her loose pants; called her "gay"; and asked if she wanted to "have a midnight workout session" and "wrestle in the dark." (Pls.' Resp. Def.'s Mot. Summ. J. at 37-38.) She also says that an unknown person pushed her bed against another empty bed.

EEO Division determined in its internal investigation of Bedon that there was sufficient evidence to support a finding that Bedon had violated the City's EEO Policy "by subjecting [Jane Does 3, 4, and 5, as well as five other female paramedics] to sexual harassment." (ECF No. 326-25, City Mem. of Oct. 17, 2018, at 23.) Since the City's EEO Policy's definition of sexual harassment tracks that of the IHRA, assert plaintiffs, the City has admitted that Raney and Bedon's actions constituted sexual harassment for purposes of the IHRA, and because they had supervisory roles, plaintiffs are entitled to summary judgment. Not so fast, says the City, arguing that even if its EEO reports are admissible, they do not constitute binding judicial admissions. The City is correct. Investigative reports such as the EEO's are "evidentiary rather than judicial admissions and hence not binding." *See Allen v. Chi. Transit Auth.*, 317 F.3d 696, 700 (7th Cir. 2003); *Sommerfield v. City of Chi.*, No. 06 C 3132, 2010 WL 3786968, at *6 (N.D. Ill. Sept. 20, 2010) (rejecting plaintiff's argument that the City's internal investigation findings conclusively established liability under Title VII, and stating that "the City is entitled to put [plaintiff] to his burden of proving his claims at trial"). Because plaintiffs' motion is based on the faulty premise that the City's admissions in its investigative reports are judicially binding, the motion is denied.

## CONCLUSION

Defendant's motion for partial summary judgment [295] is granted in part and denied in part. Summary judgment is entered in favor of the defendant, City of Chicago, and against Jane Doe 2 on Jane Doe 2's Title VII and IHRA harassment claims. Summary judgment is entered in favor of the defendant, City of Chicago, and against Jane Doe 3 and Jane Doe 4 on Jane Doe 3 and Jane Doe 4's Title VII and IHRA retaliation claims. Furthermore, plaintiffs may not use the "pattern or practice" method of proof as an independent and distinct method of establishing liability.

Defendant's motion is denied as to the remainder of plaintiffs' claims.   Plaintiffs' partial motion for summary judgment [313] is denied.

**DATE**:  March 11, 2020

**Ronald A. Guzmán**
**United States District Judge**